**RETAIL CLERKS UNION, LOCAL 648, et al., Plaintiffs,**

v.

**RETAIL CLERKS INTERNATIONAL ASSOCIATION et al., Defendants.**

Civ. A. No. 1322–68.

United States District Court
District of Columbia.

April 11, 1969.

Mozart G. Ratner, Sidney Dickstein, George Kaufmann, Washington, D. C., for plaintiffs.

S. G. Lippman, Donald Grody, George Murphy, Jon Flinker, Carl Taylor, Washington, D. C., for defendants.

## MEMORANDUM OPINION

GESELL, District Judge.

The Retail Clerks International Association (RCIA), an international union with some 600,000 members, and certain of its principal officers are defendants named in an Amended Complaint filed by certain members and locals of the Union alleging violations of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 401 et seq. The jurisdiction of the Court is invoked under Title I, Title V and Title VI of that Act. After several pretrials narrowing the issues and a determination that good cause existed for filing the Amended Complaint under Title V, testimony was taken and depositions filed. Briefs were exchanged and full argument had on the record thus made.

■ This cause of action is pressed following the RCIA's first contested election since 1944. That election, held in June 1968, resulted in a victory for the administration slate and the defeat of challengers who were members of the Reformation, Revitalization, Reconstruction (RRR) slate. The validity of this election is not before the Court, but was questioned in a complaint filed on behalf of the defeated candidates under Title IV of the LMRDA with the Secretary of Labor. The Secretary's jurisdiction with respect to setting aside the election is exclusive, Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964), and the Court has no jurisdiction in this action to inquire into and does not undertake to inquire into the validity of the election.[1]

The Amended Complaint alleges that two former Vice Presidents of the Union, John T. Haletsky and Charles J. Kelleher, were discharged as Organizing Directors in retaliation for their unsuccessful political opposition to the administration slate after they had run for Union office in the 1968 contested election. It is further alleged that RCIA and certain key officers of the Union have, since the contested election, improperly used their authority by attempting to suppress an organization known as the Committee for a Democratic Election (CFDE), which is responsible for the prosecution of this lawsuit and which is seeking, in the other proceedings mentioned, to set aside the results of the contested election. Finally, it is alleged that the long-time President of RCIA, James A. Suffridge, now President Emeritus, was ineligible to serve in those offices and that his acceptance of such offices and their financial rewards constitutes a breach of trust within the meaning of the LMRDA.

■ These three major issues here presented must be adjudicated in the light of the provisions and underlying purposes of the LMRDA. Nothing is served by discussing these purposes and provisions of the Act in detail. In the implementation of the Act, courts have frequently emphasized the paramount considerations of national policy which resulted in enactment after long and careful hearings before the Congress. Only a few of these decisions need be cited here: Wirtz v. Hotel, Motel & Club Employees, 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968); Wirtz v. Local 153, Glass Bottle Blowers Assn., 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968); Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964); Bakery & Confectionery Workers Internat'l Union of America v. Ratner, 118 U.S.App.D.C. 269, 335 F.2d 691 (1964). As these and other decisions reiterate, the Act guaran-

---

1. Although the Secretary noted certain irregularities, he refused to bring suit in the District Court to set the election aside. Certain plaintiffs have now filed a separate mandamus action (DeVito v. Shultz, Civil Action No. 78–69) in this Court to force the Secretary to bring suit, but this pending complaint is not presently before the Court.

tees union members a full right to participate in the political affairs of their union without interference or retribution and requires elected union officials to act without abusing their positions of trust. Thus, as was said in Wirtz v. Hotel, Motel & Club Employees, *supra*,

A pervasive theme in the congressional debates about the election provisions was that revelations of corruption, dictatorial practices and racketeering in some unions investigated by Congress indicated a need to protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government, and, through the election process, to keep the union leadership responsive to the membership. This theme is made explicit in the reports of the Labor Committees of both Houses of Congress. It is reflected in the discrete provisions of Title IV and also of Title I, the "Bill of Rights" for union members. * * * 391 U.S. at 497–498, 88 S.Ct. at 1747 (footnotes omitted).

The provisions of the Act are manifest, its reach is extensive and the obligation of the Federal Courts to carry forward the sound underlying congressional mandate is beyond dispute.

## I.

The Court first considers the issue as to the discharges of Haletsky and Kelleher, who were employed by RCIA as Organizing Directors. It is contended these discharges were in retribution for their participation as leading figures in the election contest which challenged the long-established management of RCIA.

Haletsky and Kelleher had each had a long experience in the Union. As Organizing Directors they were each responsible for Union activities in major sectors of the country. Both of these men had performed their duties as Organizing Directors in full conformity with Union policies. Indeed, they had been made Vice Presidents in recognition of their competent service. Nonetheless, they were each discharged as Organizing Directors soon after the ballots had been counted and their defeat as members of the opposition slate announced. Haletsky had been a candidate for President and Kelleher for Vice President. The election contest had been intense and many charges involving personalities and policies were made back and forth in the course of the campaign.

Haletsky and Kelleher received notice of discharge in identical form by separate letters dated August 16, 1968. The letter to Haletsky read as follows:

Please be advised that effective September 1, 1968, newly elected Vice President Ronald L. Meeker will accede to the office of International Ninth Vice President and will immediately assume the position of Organizing Director of the Southwestern Division.

Your term of office as International Tenth Vice President will expire at midnight, August 31, 1968. As of such date, your position as Organizing Director of the Southwestern Division will terminate. At that time, you will, of course, turn over to the new Organizing Director, all properties and possessions of the International Association, including the 1968 Oldsmobile, which are in your possession or custody. Your credentials of office and airlines credit card are to be forwarded to International headquarters.

We wish to express our appreciation for the services which you have provided to the International Association and we know that you will do everything within your power to facilitate this transition for the benefit of the new Ninth Vice President and Organizing Director and the Retail Clerks International Association. (Plaintiffs' Exhibit No. 15)

No alternative employment of any kind elsewhere in RCIA was offered or suggested to either man. No reason for discharge was given Haletsky or Kelleher either before or at the time of the transmittal of the formal uninformative

discharge letters. This course of events occurred despite the fact that Haletsky had been an employee of the International for over three years and Kelleher for over sixteen years and both had competently and faithfully performed their respective duties as Organizing Directors.

An RCIA Vice President receives no compensation merely because he is a Vice President. Under the provisions of the Constitution of the Union, a Vice President is compensated only for duties he performs in other capacities.[2] An Organizing Director receives a substantial salary as well as substantial responsibility. Paid jobs were undoubtedly desired for the new Vice Presidents elected on the administration slate. The discharges opened two positions as Organizing Directors for successful vice presidential candidates.

The decision to discharge was made by James T. Housewright, a former Vice President, who was the successful candidate for President on the administration ticket. He defeated Haletsky. Housewright testified that the decision to discharge developed in his mind during the course of the campaign and was made for the following reasons:

Well, I had three reasons for terminating then Vice-Presidents Kelleher and Haletsky.

One was because of my deep conviction that our policies and practices with regard to vice-presidents serving in divisions as divisional directors was one of the major reasons for our success.

The second reason would be that I had been an organizing director for approximately six years before becoming a vice-president, and I fully appreciated the value of being a vice-president and organizing director of a division. It enhances one's prestige. He is taken into counsel with outside organizations much more freely. He is given recognition and respect that he otherwise would not receive. He can communicate more effectively with the local unions in his particular division because of the respect given toward him as an elected International official.

The third reason would be that they were so vehemently opposed to our policy and practice as far as vice-presidents serving in this capacity, and I think I could say our practices and policies in general, that in my judgment they could not have given the support to the policies and programs of the International Union which are important to its operation and growth. (Tr. pp. 1031–1032).

 Since the discharges occurred promptly after the election, without notice, following an acrimonious election campaign during which direct and subtle pressures had been used to discourage a successful challenge, this statement of Housewright's cannot be taken at face value.

2. The pertinent sections of the RCIA Constitution read as follows:
Section 13:
It shall be the duty of the International Vice-Presidents to render such assistance to the International President as he may require and to perform such other work under his direction as he may request and to render regular reports on the progress of organizational work assigned to them and with respect to any other duties or functions which they have been directed to perform.

Section 11(L) (2–3):
2. Such International representatives shall carry out their responsibilities and duties under the direction and supervision of the International President. They shall render such assistance to the International President and carry out such assignments as he may require.
3. Compensation and other conditions of service shall be fixed by the International President. Members commissioned as International representatives shall in all respects be regarded as working within the jurisdiction of the International Association.

■ Given the overall purposes of the LMRDA, the burden shifts to defendants to justify the discharges which came so shortly after the ballots were counted. The principal justification attempted was on the ground the discharges were consistent with established policy and practice of RCIA. During Suffridge's administration from 1944 to 1968, he had often either selected or nominated for uncontested election as Vice Presidents men who had served successfully as Organizing Directors. Suffridge was a strong believer in centralized union control and felt that it was desirable for Organizing Directors to be Vice Presidents in order to enhance the influence and prestige of the former position and in effect to give the Organizing Directors policy-making status. From Suffridge's viewpoint this had advantages in the administration of the Union's affairs and strengthened control at the top. Thus it had come to pass over the years that Organizing Directors were usually eventually promoted to Vice Presidents and with few exceptions the seven Organizing Directors were also Vice Presidents.

At the time of the contested election all Organizing Directors, including Haletsky and Kelleher, were Vice Presidents. There had, however, never been a previous occasion where a Vice President lost an election and the issue of whether he should be deprived of his position as Organizing Director had never come up. In other words, there had been a progression upward from Organizing Director to Vice President with some but not complete consistency, particularly in recent years, but never had there been occasion for the process to operate in reverse.

The policy and practice relied on to support the discharges is not contained in the Union's Constitution nor indeed has it at any time been reduced to writing. It was not generally known throughout the membership. The Constitution authorizes ten Vice Presidents [3] and there have long been seven Organizing Directors. Thus it is clear that there have always been some Vice Presidents who were not Organizing Directors. Furthermore, there have been in the past Organizing Directors who were not Vice Presidents. The fact that in recent years most Organizing Directors have ultimately become Vice Presidents and that Suffridge was responsible for bringing this about seems clear from the record.[4] This by itself, however, does not establish a policy and practice of the organization.

Even assuming *arguendo* that there was such a policy and practice, Suffridge's motivation is crucial for the policy and practice must be viewed in one light if it rests solely on considerations of sound union management principles and in quite a different light if it was part of a plan or program to thwart opposition and entrench Suffridge and his immediate associates in office. On this issue Suffridge's credibility must be carefully weighed because, as has been indicated, the policy was his creature and was never written out or presented to the membership for analysis or vote.

Suffridge testified at some length but his testimony left much to be desired. It was incomplete and not always candid. Other proof in the case was consistent with the Court's impression gained from Suffridge's demeanor. Justifiably proud of his accomplishments as a union leader, Suffridge could not tolerate opposition. During the contested election he and persons acting with his knowledge threatened and cajoled the opposition

---

3. Section 8(A) states in part:

> (A) The officers of this International Association shall consist of an International President, ten (10) International Vice-Presidents, numerically designated, one (1) through ten (10) * * *.

4. While Haletsky and Kelleher were warned by Suffridge at the time the rival slate was proposed that their jobs were at hazard, this warning was given to prevent the election contest and maintain "harmony," and does not establish the "policy" or "practice" on which defendants rely.

and Suffridge permitted manipulation of Union records and other actions designed to confuse the facts as to his status as a dues-paying member. It is unnecessary to deal with these matters in detail for they are collateral to the central issues in this case. The Court is persuaded from the weight of the evidence as a whole that a basic motivation for the so-called policy and practice, to the extent it existed, was to place control of the Union in the hands of persons amenable to Suffridge's precepts and to minimize the possibility of any viable opposition.

█ Thus, even if the existence of the policy and practice had been more firmly established by the proofs it cannot serve to justify the discharges. Where a union policy and practice is promulgated in order, among other things, to place obstacles in the way of effective union democracy and appears to have this effect, as the Court concludes is the situation in this instance, the Court cannot give that policy any recognition as it offends both equity and the provisions of the LMRDA. *Cf.* NLRB v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963).

█ Defendants emphasize and re-emphasize Suffridge's great contribution to the Union's growth and prestige, the benefits the rank-and-file received from his stewardship and the absence of any proof of personal dishonesty on Suffridge's part. Even success and honesty, however, do not justify a union officer taking steps in the name of policy designed to make opposition from elements within the union more difficult, no matter how misguided such opposition may be. No compromises may be had with the fundamental requirement of union democracy guaranteed by LMRDA. Therefore, the policy and practice, even if it existed, was tainted by its origin and purpose and it cannot be used by Housewright at the outset

of his term of office to justify the discharges.

Thus defendants not only failed to establish 'the existence of an organizational policy and practice which necessitated the discharges in question, but even if they had succeeded the policy and practice, under the circumstances, cannot lawfully be implemented so as to remove unsuccessful candidates from appointed office.

█ The only remaining explanation for dismissing Haletsky and Kelleher from their salaried positions as Organizing Directors is their political opposition to the administration slate and their differing philosophy as to union management. It is true that Haletsky and Kelleher had favored decentralized control of the Union in the contested election. Yet if in any *substantial degree, cf.* NLRB v. Whitin Machine Works, 204 F.2d 883 (1st Cir. 1953), the discharges are in retribution for their having stated their different philosophy by participation in the election, the discharges cannot stand. This remaining explanation, stripped of its polite language, comes to nothing more than a bland announcement that those in high places who disagree lose their jobs. The discharges cannot be justified on any ground presented and hence must be said to violate the letter and spirit of the LMRDA.

█ Section 101(a) of the Act guarantees to each member of a labor organization the right of free expression and free participation in the union's democratic processes.[5] To be disciplined for exercising this right offends § 609.[6] The right of free expression belongs to each member, regardless of any additional status that particular member may possess as an appointed official or as an elected officer of a union. This the basic policies of the Act command.

█ Union members cannot, under the terms of the Act, be placed in the

---

5. 29 U.S.C. § 411(a).

6. 29 U.S.C. § 529.

predicament of choosing between their right of free expression under § 101(a) and their jobs. This fundamental concept of the goals and prohibitions of the LMRDA is supported by the decision in this District, Alvino v. Bakery Workers Union, 46 L.R.R.M. 2812 (D.D.C.1960), which has been approved in Bakery & Confectionery Workers Internat'l Union of America v. Ratner, 118 U.S.App.D.C. 269, 335 F.2d 691 (1964). It is also the teaching of Grand Lodge of Internat'l Assn. of Machinists v. King, 335 F.2d 340 (9th Cir. 1964), cert. denied, 379 U.S. 920, 85 S.Ct. 274, 13 L.Ed.2d 334 (1964), which this Court accepts.

 Those who hold responsible offices in a labor organization may well be in the best position effectively to challenge the incumbent group which, in the nature of things, seeks to be entrenched. Members holding these senior posts can perhaps best understand the actions of a union hierarchy and marshal political support when situations arise that can only be properly resolved by the democratic process which the LMRDA guarantees. To withhold even partially the full rights of free expression from such members by allowing their superiors to discipline them in the name of policy or otherwise because they have unsuccessfully opposed those in authority would effectively weaken the ideal of union democracy.

 Since the discharges violate § 609, plaintiffs Haletsky and Kelleher are entitled to appropriate relief under § 102 of the Act.[7] The Court will order full reinstatement of Haletsky and Kelleher to their respective positions as Organizing Directors of the RCIA. Both men are further entitled to any losses of pay and fringe benefits which resulted from their illegal discharges, after taking into account any remuneration received as a result of subsequent employment. Also, they must be reimbursed for additional expenses incurred due to the dismissals.

Plaintiffs have contended that the discharges of Haletsky and Kelleher constituted a breach of trust by defendants under Title V of LMRDA,[8] and therefore they are entitled to counsel's fees. It must be decided first whether the discharges come within the terms of a breach of trust and, second, whether there can be an award for counsel's services, lacking a monetary recovery under § 501(a).

 The ruling of the Court of Appeals for the District of Columbia in Bakery & Confectionery Workers Internat'l Union of America v. Ratner, *supra*, controls the determination of this issue. There the Court approved a reasonable assessment against the union for counsel's services which benefited the union as a whole. One thrust of the opinion was that Title V's obligations encompass not only the proper handling of money and property but the protection of political rights as well:

Here the defalcation and pilfering of the International's treasury by Cross and others, the impairment of the pension funds of the membership, the establishment of proper accounting procedures, the calling of a convention for membership expression and control, and the requirement of conformity by the officers with the International's constitution in their conduct of the business of the International were among the proper subjects of concern to the entire membership. * * * 335 F.2d at 696.

Indeed, counsel's services in the related litigation, Alvino v. Bakery Worker's Union, 46 L.R.R.M. 2812 (D.D.C.1960), which reinstated politically disciplined officers of the union, were included in the trial court's compensation award and this action was specially approved by the Court of Appeals. Bakery & Confectionery Workers Internat'l Union of America v. Ratner, 335 F.2d at 695, n. 9. Furthermore, the decision made clear it was not necessary that relief under § 501 of the LMRDA be in the form of

7. 29 U.S.C. § 412.

8. 29 U.S.C. § 501 et seq.

a monetary recovery in order for a court to award attorney's fees.

 In the present case now before the Court, although the specific relief is the reinstatement of two individuals, the effect of such a ruling is to further the rights of free expression within the RCIA, thereby benefiting the Union and its members as a whole. Accordingly, since the discharges in the circumstances of this case also come under Title V, the Court will award plaintiffs and their attorneys such expenses and fees which are reasonable for the prosecution of this part of the lawsuit, the amount to be determined in subsequent proceedings.

## II.

The second major issue in this case revolves around the status and activities of the Committee for a Democratic Election (CFDE). Plaintiffs allege that defendants are harassing CFDE which is a properly conceived organization pursuing legitimate goals. Defendants contend that CFDE, as it is now operating, violates § 401(g) of the LMRDA [9] and certain sections of the RCIA Constitution. Basically, a legal issue is presented on facts that are not seriously in dispute.

The evidence discloses that after approximately six months of a vigorously contested election campaign for International offices, balloting took place in the RCIA local unions during the month of June, 1968. It became "obvious" to the eventual organizers of CFDE during the course of the balloting and before any counting of the ballots that the election had been "stolen" from them by election irregularities induced by the administration slate and its sponsors. Meetings occurred in July attended primarily by RRR candidates. Various RRR supporters were also in attendance. Discussions centered around what steps should be taken to contest the election and to restore democracy to the Union. The result was the formation of CFDE, an organization composed of one officer appointed by each of the subscribing RCIA local unions. CFDE thereafter adopted the following resolution:

Substantial irregularities affecting the 1968 election of International officers of the Retail Clerks International Association, AFL–CIO, abuses of fiduciary duty by International officers, and serious threats of reprisals by International officials against the exercise of democratic membership rights having been reported, it is hereby resolved that the Committee for Democratic Election (CFDE) is created and established to restore democratic government and fiduciary responsibility to this International Union by vindicating the fundamental rights of the entire membership to a fair, democratic election and to lawful administration of International power and resources in the exclusive interest of the entire membership.

Civil Action No. 1322–68, in the United States District Court for the District of Columbia, alleges conduct which violates the fiduciary duty of International officers. It is hereby resolved that CFDE assume control of and responsibility for said civil action, as a vehicle for exposing and correcting International official misconduct violative of membership rights.

CFDE shall, in addition, take all steps necessary or incident to the protection of this Committee, its members and supporters from reprisal by International officers exercising International authority, power and resources. (Plaintiffs' Exhibit No. 7).

A Resolution of Support of CFDE was drafted which was then passed by majority vote by certain RCIA local unions. These locals thereby became members of CFDE and pledged specified amounts of financial aid on a per capita basis from their local treasuries.

The activities of CFDE have basically been two-fold. First, CFDE undertook

9. 29 U.S.C. § 481(g).

responsibility for this lawsuit on the basis of the original complaint. It has, through its counsel, filed the Amended Complaint which modified and updated the action and thereafter participated in numerous pretrial conferences which further streamlined the litigation. Second, CFDE assumed control of the challenges to the election before the Executive Board of the Union and sponsored a petition to the Secretary of Labor under § 402[10] in an attempt to have the election declared invalid. Its latest efforts have been to file the mandamus action previously mentioned against the Secretary of Labor to cause him to initiate action in the District Court against RCIA under Title IV.

President Housewright, upon the advice of the Union's General Counsel, sent a letter to all local unions on August 9, 1968, stating that in his opinion expenditures of local union funds to support CFDE's announced purposes was illegal and expressly prohibited by § 401 (g) of the LMRDA and by the RCIA Constitution. Housewright asserted that local union officials have a fiduciary duty in the handling of union funds and that those who participate in the diversion of union funds to CFDE do so at their peril, subjecting themselves to possible civil and criminal liabilities.

Housewright determined it was his constitutional duty as International President to issue such a letter to RCIA locals. Plaintiffs assert that the letter impedes organized political opposition to RCIA's administration and that the

Act in no way prohibits an organization such as CFDE. A continuing controversy as to the meaning and effect of § 101(a), § 401(g) and the RCIA Constitution is therefore presented and the Court's jurisdiction is invoked under § 102 of the LMRDA and under the Declaratory Judgment Act[11] to settle the issues involved and declare the rights of the respective parties.

The obvious purport of § 401 (g) of the Act[12] is to prohibit a labor organization from showing a preference for any one candidate and to prevent candidates from depleting union treasuries through election campaigns. It was aimed at all candidates but especially towards incumbents who, once in office, might abuse their trust to become more entrenched. The section reflects the principle of union democracy that individual members are free to support persons of their own choosing in an election and cannot be forced directly or indirectly by dues diversion to lend support to others whom they oppose.

Defendants urge that this lawsuit is really an RRR election campaign device and since CFDE is attempting to overturn the election, the money raised by CFDE from local dues violates § 401(g) of the LMRDA. More specifically, defendants claim that CFDE's activities are designed to put RRR candidates into office and that CFDE is nothing more than RRR electioneering in disguise.

There is no question but that RRR candidates and some of their supporters formed and are active in

---

10. 29 U.S.C. § 482.

11. 28 U.S.C. § 2201. Although the Declaratory Judgment Act was not invoked in the Amended Complaint, the plaintiffs have relied on that Act in their briefs without opposition and the Court deems it proper under Rule 54(c) of the Federal Rules of Civil Procedure to consider the Amended Complaint in the light of that Act. No prejudice to defendants arises from this determination.

12. 29 U.S.C. § 481(g):
No moneys received by any labor organization by way of dues, assessment,

or similar levy, and no moneys of any employer shall be contributed, or applied *to promote the candidacy of any person in an election* subject to the provisions of this subchapter. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election. (Emphasis added.)

CFDE, that CFDE is now the sponsor of this lawsuit which was initiated during the campaign, and that CFDE supports other challenges to the election. For persons to organize to carry forward such a suit as this, which involves possible breaches of trust and possible denials of free expression, is entirely appropriate and the legality of such an undertaking is not changed because the initiative comes from defeated candidates or their supporters in a past election. To interpret the words of § 401 (g) "to promote the candidacy" in the manner defendants urge would conflict with other titles of the Act. The prohibitions of § 401(g) refer to direct contributions from union treasuries to candidates for, as examples, the printing and distributing of campaign literature, the renting of campaign offices, and the paying of campaign personnel. Under the circumstances of this case, at least, this lawsuit is not in the class of activities prohibited by § 401(g).

In Moschetta v. Cross, 49 L.R. R.M. 2428 (D.D.C.1962), then District Judge, now Circuit Judge Tamm ruled that LURC, a dissident organization of local union officers within the Bakery Workers Union, was protected by Title I in its efforts to oust the incumbents from any harassment by the union's administration. *See also*, Moschetta v. Cross, 46 L.R.R.M. 2810 (D.D.C.1960). Accordingly, union contributions from local treasuries to CFDE for the carrying on of this lawsuit as framed by the Amended Complaint are not illegal.

With respect to the financing of the CFDE challenges to the results of the election, whether by complaints lodged with the RCIA Executive Board, complaints lodged with the Secretary of Labor, or the initiation of the mandamus action, the Court also finds these activities to be outside the prohibitions of § 401(g). It does not promote the candidacy of any person if an election is declared invalid by a court under Title IV's procedures despite the fact that in the rerun election the candidates

may be identical. Neither the winner nor the loser of the disputed election gains votes by the setting aside of the election. Such action is not a vote-getting device but merely returns the parties to their pre-election status; it does not place any candidate into office.

Appeals and complaints after the ballots are counted do not constitute part of the *election* itself. Any monies employed to promote legitimate legal challenges to the election therefore cannot fit the description of promoting the candidacy of a person in the *election*. Thus, CFDE's activities, including its raising of funds through per capita taxes, to pursue challenges to the RCIA election are not illegal. Compare Bakery & Confectionery Workers Internat'l Union of America v. Ratner, 118 U.S. App.D.C. 269, 335 F.2d 691 (1964) and Johnson v. Nelson, 325 F.2d 646 (8th Cir. 1963), with Wirtz v. Independent Workers Union of Fla., 272 F.Supp. 31 (M.D.Fla.1967).

CFDE, although technically an organization of local unions, is in practice a group of individuals who occupy leadership positions in RCIA local unions and state councils and who have authority to speak for their respective constituencies. These individuals are themselves union members. As such, it seems apparent that under § 101(a) (2) they have the right to meet and assemble freely with other members. But obviously they cannot speak and they cannot assemble effectively if they cannot organize. If union democracy is to be preserved, members must not lose the protections of free expression because they decide to proceed on one basis rather than another. *See* Moschetta v. Cross, 49 L.R.R.M. 2428 (D.D.C.1962). Indeed, some form of joint activity seems particularly appropriate when realities of modern litigation are considered and it is realized that the full resources of the International Union are available and in fact being used to defend the newly elected officers against these very attacks.

■ Apart from the provisions of the Act, defendants contend that CFDE's manner of raising funds violates the RCIA Constitution because it is an appeal for local funds not properly approved by the International Board and because it is a per capita tax upon the local union's treasury for purposes outside the union's proper expenditures. The constitutional provisions set out in the footnote are far from clear in this regard.[13] But even accepting the fact that the interpretation urged by defendants is a fair interpretation of the particular provisions of the Union's Constitution and entitled to weight under the rule of English v. Cunningham, 108 U.S.App.D.C. 365, 282 F.2d 848 (1960), the contrary requirements of § 101(b) of the LMRDA[14] must prevail. That section states that any provision of a labor organization's constitution inconsistent with the provisions of § 101(a) is of no force or effect. Since the constitutional interpretation suggested interferes with activities of CFDE that are protected by the Act, it is of no force or effect. See Moschetta v. Cross, *supra*.

■ Plaintiffs press for more than a declaratory judgment, contending that Housewright, by sending a letter which was designed to interfere with CFDE's fund-raising activities, breached his trust as an officer under Title V. But Housewright acted on advice of counsel in an area reasonably open to legal dispute. Under the circumstances, his actions do not rise to the level of a breach of trust. Plaintiffs' reliance on the *Bakery Workers* litigation, where the union came into court seeking to enjoin LURC, Moschetta v. Cross, 49 L.R.R.M. 2428 (D.D.C.1962), is not in point. In that case there were two outstanding injunctions against the incumbents restraining their interference with the challengers' political activities. See Moschetta v. Cross, 46 L.R.R.M. 2810 (D.D.C.1960), and Alvino v. Bakery Workers Union, 46 L.R.R.M. 2812 (D.D.C.1960).

■ Plaintiffs are, however, as already indicated, entitled to a declaration of the rights of CFDE. The Court holds that CFDE's activities are legally protected to the extent that they encompass the pursuit of this lawsuit and the pursuit of challenges to the election. These activities may be lawfully financed from local union treasuries upon a proper vote by the majority of the members. To this extent the defendants shall be enjoined from directly or materially interfering with these CFDE activities in any manner, including threatening, disciplining, penalizing, or coercing individual union members or locals by reason of their support of CFDE. To the extent that the defendants have already inter-

---

13. The pertinent clauses of the Constitution state:

§ 22(E) No District Council or Local Union chartered by the Retail Clerks International Association, or any of its members, shall issue an appeal for financial aid from a Local Union or District Council of this International Association, or offer for sale tickets of any character, or request contributions for any purpose outside of the jurisdiction of the Local Union or District Council; or solicit advertising for any purpose whatsoever, unless first securing the approval and consent of the International Executive Board. Any District Council, Local Union or member found guilty of violating this section shall be subject to discipline by the International Executive Board.

§ 43(A) (1). The general funds or property of a Local Union shall be used only for such purposes as are specified in the Constitution and laws of the International Association and as may be required to transact and properly conduct its business, provided such expenditures are legally authorized by the membership of the Local Union.

The Local Union may furthermore include in its bylaws provisions for establishing and maintaining special funds; such as strike benefits, scholarship programs or building funds, by specific allocation out of monthly dues.

In the event of a community disaster a Local Union may contribute funds to assist its members. The Local Union shall, under no circumstances, use any of its funds for loans or donations to members, or for partisan political or religious purposes.

14. 29 U.S.C. § 411(b).

preted the Constitution so as to call into question the legality of CFDE contributions, the Court holds such interpretations are contrary to § 101(a) (2) and § 101(a) (4) and hence are of no force or effect under § 101(b). On the other hand, the injunction obviously shall not extend to electioneering activities on behalf of RRR candidates in any subsequent election and there is no legal basis on which CFDE may assume past election obligations.[15] See Wirtz v. Independent Workers Union of Fla., 272 F.Supp. 31 (M.D.Fla.1967). Finally, the Court in its discretion will not grant plaintiffs' request for attorneys' fees for this phase of the litigation.

### III.

The final issue is a tempest in a teapot. Suffridge was President of the Union from 1947 to 1968 and since the latter date has acted as President Emeritus under a specific provision of the Union's Constitution. He served well and faithfully. His membership dues, amounting to between $48 and $84 a year, were paid for him by his local union commencing in 1954. Plaintiffs contend that by reason of this circumstance he must be considered not an active member, that since only active members can be officers under the RCIA Constitution[16] he was ineligible for office, and that accordingly the Court should order

Suffridge to return to the Union treasury all salary he has received from 1954, including compensation he is now receiving as President Emeritus.

The RCIA Constitution does not prohibit a local union from paying an officer's dues and plaintiffs' contentions are without merit.

The testimony disclosed that Suffridge had been chief officer of his local union and in a substantial degree had been responsible for its growth and success. After Suffridge assumed higher office the local desired to honor him. When Suffridge was at a union dance, the local, in the midst of other festivities and with little formality, made him a "life member." Thereafter the local assumed his dues with his acquiescence. This state of affairs was not widely publicized and became an issue in the contested election, even though, by that time, Suffridge was not himself standing for office. It was in this context that the manipulation of Union membership records referred to earlier and other dissimulation took place. This reprehensible conduct heaped coals on this controversy and has given the issue more emphasis than it deserves.

Under the Union's Constitution as it existed in 1954 a paid-up life membership only could be given to an unemployed member over age 65.[17]

15. It will be necessary for CFDE to keep complete financial records in order to insure proper compliance.

16. RCIA Constitution, § 9(A) provides:
(A) Any active member of the Retail Clerks International Association in good standing, who is actively employed within the jurisdiction of the International Association and who has been a member of the Retail Clerks International Association in continuous good standing for at least three years preceding January 1 of the year in which the election is held, and who is a citizen of a country covered by the jurisdiction of the International Association, shall be eligible to hold any office within the gift of this International Association. Such person must be a member of this International Association through a Local Union in good standing. This section shall not

be construed to debar any member who holds a salaried position with the Retail Clerks International Association, or any of its chartered subordinate bodies or any organization approved by the International Executive Board with which the Retail Clerks International Association is affilated, and who is otherwise qualified as hereinbefore set forth.

17. RCIA Constitution (1951), § 33(d) provides:
(d) Any Local Union may include in its constitution and by-laws provisions which, when approved by the International Secretary-Treasurer, shall authorize the Local Union by resolution duly adopted at a regular meeting thereof, and a certified copy of such resolution filed with and approved by the International Secretary-Treasurer, to issue paid-up life memberships in the Local

Plaintiffs suggest Suffridge accepted such a membership at the hands of his local and in effect must therefore be considered an inactive member. But Suffridge remained employed, was not over age 65 at the time and noted his ineligibility for paid-up life membership status when he was honored. Under the present Constitution a paid-up life member must not be working within the Union's jurisdiction.[18] Suffridge was always and still remains employed by the RCIA. Thus, he never was a paid-up life member and an effort to transform him into one when he did not even possess the prerequisites will not be entertained.

The simple issue presented is whether the Union's Constitution prevents a local from paying an officer's dues. While the language of the Constitution as a whole creates some ambiguities in this regard, there is no explicit prohibition and the Constitution has been interpreted by the International Executive Board as permitting such payments. Section 6(I) does not state that all members must pay their own dues but only that each member's dues must be paid.[19] This is necessarily so, the defendants point out, because under § 33(E) the local unions are permitted, in certain circumstances, to pay the dues of an active member.[20] If § 6(I) were to be read that all members must pay their own dues, it would conflict with § 33(E).

Defendants contend that the language of § 33(E) is permissive and not exhaustive, as plaintiffs allege, and would permit a local union to pay the dues of a member, including an International officer, it wanted to honor. As other examples, former International President Vernon A. Housewright and former International Vice President Murray Plopper were granted such honors while in office. Given the wording of § 6(I) and § 33(E) it seems to the Court that the International Executive Board's interpretation of the Union's Constitution is reasonable and must be accepted under the doctrine of English v. Cunningham, 108 U.S.App.D.C. 365, 282 F.2d 848 (1960). Thus, Suffridge, although he did not pay his own dues after 1954, was always an active member in good standing and not a paid-up life member and was thereby eligible to hold International office.

Plaintiffs speak in terms of breach of trust. In spite of the constitutional interpretation it is conceivable that an officer would breach his trust if he permitted a local to pay his dues in return for favors. But here the dues payment flowed more naturally from the local's pride that "one of its boys" had

Union to any of its members who have, or shall arrive at the full age of sixty-five (65) years or more and who shall be unemployed and who shall have been in continuous good standing in the International Association for a period of five (5) years prior to the adoption of said resolution. * * *

18. RCIA Constitution § 33(D)1. provides:

(D)1. Any Local Union may issue paid-up life membership in the Local Union to any of its members who have maintained fifteen (15) years' or more continuous membership in good standing in the International Association and who shall not be working within the jurisdiction of the International Association. Such members may attend Local Union meetings but shall not have voice or vote.

19. RCIA Constitution § 6(I) provides:

(I) All members shall be required to conform with and abide by all of the provisions of this Constitution and laws of the International Association and such other regulations as the International Association may make in conformance herewith and those of the Local Union of which they are members and to pay all dues and assessments levied by the International Association and Local Union promptly as they become due.

20. RCIA Constitution § 33(E) provides:

(E) Any Local Union may include in its bylaws a provision for payment by the Local Union of the dues of such of its members who are temporarily incapacitated due to illness, under a physical disability or who are unemployed due to an authorized strike, or due to a lockout, or who are officers in the employ of the Local Union.

reached the top and there is absolutely no indication that any favors were received by the local in return for its generosity or indeed that any favors were even requested. Thus, on the facts of this case, there is nothing that would warrant bringing the strictures of Title V into play. If the membership does not wish this practice to continue in the future, democratic processes are available to bring about an appropriate amendment to the Union's Constitution.

This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law. Counsel to settle order in ten days.