Frederick D. **PRICE** et al., Plaintiffs,

v.

**UNITED MINE WORKERS OF AMER-ICA** et al., Defendants.

Civ. A. No. 188–73.

United States District Court,
District of Columbia.

May 23, 1974.

---

Roger E. Zuckerman, Edwin A. Williams, Washington, D. C., for plaintiffs.

Lewis D. Sargentich, Daniel B. Edelman, Washington, D. C., for defendants.

## OPINION

WILLIAM B. JONES, District Judge.

This action was instituted by plaintiffs Price, Burich and Trulos against the United Mine Workers of America (Union) and Arnold Miller (International President of the Union), in which plaintiffs seek to enjoin defendants from discharging them from their jobs as Union employees and from engaging in conduct intended to harass, intimidate or degrade plaintiffs in order to force their resignations as Union employees or otherwise to discipline them for their expressions of political choice during the Union elections of 1969 and 1972. Plaintiffs assert that the notices of discharge issued to them in January, 1973, violated the Labor-Management Disclosure Act of 1959 and particularly Section 101(a)(1) and (2). 29 U.S.C., Sec. 411(a)(1) and (2). Plaintiffs sought a preliminary injunction and this Court, pursuant to Rule 65(a)(2), Federal Rules of Civil Procedure, ordered the trial of the action on the merits to be advanced and consolidated with the hearing of the application for preliminary injunction.[1] The case has been tried to the Court without a jury and this opinion shall constitute the Court's findings of fact and conclusions of law.

In December, 1972, Miller was elected International President of the Union. On January 26, 1973, he addressed letters to Price and Burich. He advised Price that his position as Deputy Director of the Safety Division of the Union would be abolished effective February 1, 1973, and as of that date Price's services would no longer be needed and that he would be given two weeks' severance pay at his then salary. The letter to Burich was to the same effect in that Miller advised Burich that his position as Assistant to the Director of the Safety Division would be abolished February 1, 1973, and that as of that date Burich's services would no longer be needed and that he would be given two weeks' sever-

---

1. By agreement of the parties, the plaintiffs have continued in the employment of the Union pending the decision in this case.

ance pay at his then salary. On January 29, 1973, Miller addressed a letter to Trulos advising him that his service as Director of the Department of Manpower Training and Education of the Union would be terminated effective February 1, 1973, and that he would be given two weeks' severance pay at his then salary. Each plaintiff asserts that his discharge as of February 1, 1973, resulted from his support of William A. Boyle in the 1969 and 1972 Union election campaigns. Miller was Boyle's opponent for the office of International President in the 1972 election. In other words, plaintiffs claim that their discharges were actual reprisals for their political support of the opponent of Miller.

As it has been noted, Price and Burich were employees of the Union with positions in the Safety Division, while Trulos was Director of the Manpower Training and Education Department of the Union. In parts at least the facts pertaining to Price and Burich are different from those pertaining to Trulos and this opinion will treat with the claims of the former two and then discuss Trulos' claim.

## I. Claims of Price and Burich

Price is 55 years of age. For two years after finishing high school he attended college at Lincoln University. In 1940 he joined the Union and thereafter worked as a miner in various capacities. During this period he attended night school at Pennsylvania State University's extension division and studied coal mining. He received qualifying papers in several areas of coal mining and in 1945 he qualified as a mine examiner and in 1946 he qualified as a first-grade assistant mine foreman. And in 1950 Price qualified as a first-grade mine foreman.

In 1961 Price sustained a broken neck while working in a mine tunnel and thereafter was only able to do lighter mine-related work.

In June, 1968, Price was elected by members of his local union to the mine safety committee. He served in that capacity for a short period of time and then was appointed by Boyle, then International President of the Union, as the Union's District 4 representative. In that capacity, he served local unions and handled grievances and complaints of miners. He was appointed Safety Coordinator for District 4 in February, 1970. In that capacity he worked with local mine safety committees and with the Safety Director of the entire Union. While Boyle was President, Price in August, 1971, was appointed Acting Deputy Director of the Safety Division of the Union and in February, 1972, President Boyle appointed Price as Deputy Director. During the period that he served as Acting Deputy Director and Deputy Director he was stationed in Washington at the Union's national headquarters. On occasion he would visit mine sites in the field but his work for the most part was in Washington. He was holding the position of Deputy Director of the Safety Division when he received his letter of discharge on January 26, 1973.

Burich is 50 years of age. While attending high school in Pennsylvania, he took two years of mining courses. In April, 1942, he joined the Union as an apprentice miner and in 1945 he received state certification as a qualified "shot fireman." In 1956, he was elected to the mine safety committee of his local union. In that capacity he investigated mine accidents involving both loss of life and serious injuries. He served for 16 years on the mine safety committee and during that period talked to miners on mine safety. In 1966 he was elected auditor of his local and he continued in that capacity until he resigned to accept the appointment in 1972 as Assistant to the Director of the Safety Division. He was appointed to that position on February 1, 1972, by President Boyle. His work in that capacity was at the National Headquarters in Washington, although it did involve some field investigation of certain safety factors as well as instructions to local safety commit-

tees and district safety coordinators. It was in that position that he was serving when he received his January 26, 1973, notice of discharge.

Both Price and Burich had participated to some extent in the 1969 campaign of the Union in which Boyle was opposed by the late Joseph Yablonski. During the 1972 election they were under the restriction placed upon the employees of the Union as far as political participation was concerned by the order of Judge Bryant of this Court in Hodgson v. United Mine Workers of America, D.C., 344 F.Supp. 17 (1972). The most they did in the 1972 elections was during week-ends at their homes in Pennsylvania. Their campaigning during that period was considerably limited. Burich's 1972 campaigning consisted of writing two letters to the editor of a local paper in Uniontown, Pennsylvania, which were published as letters to the editor. One letter was not signed. The second one was. Price's 1972 campaigning consisted of very limited discussions over week-ends with the local miners in his home area.

While there is some conflict in the evidence with respect to the extent of Burich's 1969 campaigning, I accept the statement he made in his affidavit filed in this action and dated February 6, 1973, that he engaged in no active campaigning. Price's 1969 campaigning I find to have been very limited.

Prior to the election in 1969, there was a very serious mine accident at Farmington, West Virginia. That accident took the lives of 78 miners. It was a definite activating force in bringing the late Joseph Yablonski into the campaign as a candidate for the international presidency. In that campaign he was supported by, among others, Miller, now the International President. A dominating issue raised in the 1969 campaign was mine safety. And again in the 1972 campaign when Miller opposed Boyle mine safety was a principal issue. The slogan asserted by the Yablonski-Miller

forces was that coal was to be mined safely or not at all.

It was following the Farmington mine disaster that the 1969 Federal Coal Mine Health and Safety Act, 30 U.S.C. 801 et seq., was passed. Miners who were daily facing the possibility of injury or death while working in the mines were naturally concerned for their own welfare. The Yablonski-Miller group found support in such apprehension on the part of the working miners. In the 1972 campaign President Miller considered this matter to be an issue of "moral decency and a mandate of moral responsibility that the officers of this Union, every man in the Union had a responsibility." (Transcript 1565–66) Miller himself was a victim of coal mining as he suffers "black lung" disease. During the campaign he visited as many as 400 mines and from that experience as well as his earlier personal experiences he was satisfied that the safety programs of the Union were not meeting the needs of the miners for safety and health in their every day work. When he assumed office on December 22, 1972, he was determined that that condition would be remedied. He was intent on reorganizing the Safety Division to make it accomplish the purpose which he conceived that Division had.

Miller's plan, which has been in large part effectuated since December, 1972, called for an experienced executive director and he found such an executive director not among the members of the Union but in the person of a District Director of the United States Bureau of Mines. Miller and his supporters were also of the view that the existing Safety Division had failed completely in research and education and that if mine safety was to be effective research and education would be necessary. Again, the person selected as the Director of Research and Education of the reorganized Safety Division was not a member of the Union but was a mining engineer who had taught at the West Virginia School of Mines. Moreover, Miller was

of the opinion that the 1969 Federal Coal Mine Health and Safety Act presented many legal matters connected with the enforcement of the Act by the United States Bureau of Mines. In order for the Safety Division to assist the Bureau of Mines a lawyer in the Safety Division was considered necessary. The reorganization of the Safety Division provides for the position of a Safety Solicitor, a position Price recognized was necessary.

It was Miller's view that the Safety Division, as it had operated prior to December 22, 1972, had failed in enforcing safety in the field and that such failure could only be remedied under the direction of a field director. Miller has chosen a Union member, who, from Miller's personal observations, had proven himself to be perhaps the most efficient grievance representative of the Union at the local level. And to further the safety program of the Miller faction, the new International President was at the time of the trial of this case organizing an International Safety Committee, which is to consist of from three to five persons charged with the responsibility of making inspection of the mines at the mine sites and to provide field support at all mines.

As has been noted, Miller took office on December 22, 1972. Immediately thereafter he appointed Davitt McAteer as an assistant to the President. McAteer has never been a miner but he is a student of mining conditions. As a law school student he together with other students made a study of mine safety and published the results of that study. Thereafter, and particularly during the 1972 campaign, McAteer conferred with Miller concerning mine safety and McAteer's views about making the mines safe and healthy. In his capacity as assistant to the President, McAteer on December 27, 1972, presented himself at the Safety Division office of the national headquarters. There he conferred with the Director of the Safety Division, Kenneth Wells, Deputy Director Price, and Assistant to the Director Burich. Price and Burich are most critical of this meeting because of the manner in which they state they were treated by McAteer. While it is possible to draw from the evidence that McAteer's style might be considered rough, that in itself cannot be said to show any reprisal.

At the meeting McAteer advised that he had been sent there by Miller to discuss with the Safety Division personnel the work of the Division and he asked Wells, Price and Burich to give him statements of their activities and their views as to strengthening the Division. At the same time McAteer made some study of the files in the office, which he later testified were in a disorganized condition and lacking in certain necessary materials. Thereafter, on December 29, McAteer presented to Wells, Price and Burich letters addressed to each dated December 28, 1972. In evidence here are the letters to Price and Burich. Each letter was critical of the work of the Division and each letter requested the addressee to resign. Both Price and Burich refused to resign. Each continued in his position thereafter until his letter of discharge of January 26, 1973.

McAteer, Miller, and Vice President Trbovich testified that the letters requesting the resignations of Price and Burich were a result of what they knew from their own experiences in the field of the failures of the Safety Division of the Union. They further explained that Price and Burich were offered the opportunity of resigning, although they were not at the time, December 28, 1972, as satisfied of the individual failings of Price and Burich as they were subsequently as a result of their further understanding of those persons and the ineffectiveness of their work in the Division.

In the letter requesting the resignation of Price, Miller was critical of Price because he did not "speak out" about the inadequacies of the Safety Division. Price argues that this is evi-

dence that Miller had expected Price to support the Miller ticket in the 1972 election on the grounds of an ineffective Safety Division. Both Miller and McAteer, who assisted in the drafting of the letter, testified that that was not the purpose of using the term "speak out" but rather a criticism that if Price was aware of the deficiencies of the safety program, he had a moral responsibility to be critical of the work of the Division and demand more from it. I do not find that the term "speak out" is evidence of any reprisal motivation.

In early January, 1973, Director Wells, Price and Burich were directed to go to the Blacksville, West Virginia, mine to participate in the recovery operation. There had been an explosion in that mine some time before and efforts were to be made to remove the bodies of the miners whose lives were taken in that disaster. During that recovery operation, Wells and Price stayed above ground, monitoring, as they testified, the matter of dangerous gas that would affect the mine recovery operation. Burich on at least one occasion went underground. Miller was dissatisfied that Price and Wells did not go underground during that recovery operation as he was of the view that the most responsible people in the Safety Division should in the case of all mine disasters go underground to ascertain for themselves the causes of such disasters. It is Miller's position that Safety Division officials so informed could more effectively plan and work to avoid future mine disasters. This view of Miller was made know to Price and to Wells.

In the middle of January, 1973, the newly appointed Safety Director, Liming, directed Price to proceed to the Farmington, West Virginia, mine to assist in the recovery of the miners who in 1969 had died in that accident. Price was specifically directed to go underground to assist in that recovery. While he did go underground, Price has complained in this action of such a requirement, contending among other things

that since he suffered from "black lung" disease, he was unable to remain in the mine without suffering serious physical reactions. I am satisfied from my review of the evidence that Price was of the view that Miller's expectation of the top Safety Division personnel to go underground in the case of mine disasters and recovery operations was without merit. I am also satisfied from the evidence that whether Miller's position in this respect is sound or not, he was sincere in his belief and as International President of the union he had every right to expect the Assistant Director of the Safety Division to undertake underground activities. I do not conclude that such a requirement on Miller's part was in any way an act of reprisal in violation of the Labor-Management Reporting and Disclosure Act of 1959.

Price and Burich also assert as evidence of reprisal motivation a statement McAteer made, according to Price and Burich, on December 29, 1972, when he delivered to them Miller's December 28, 1972, letters requesting their resignations. According to Price and Burich, McAteer at that time stated as a reason for the resignations being requested was Miller's "political commitments." McAteer denies making a statement of "political" commitment. Moreover, defendants contend and adduced evidence that the successful 1972 Miller slate did make a commitment that there would be an effective Union safety program. Miller during the campaign gave assurances that if elected he would see to the Safety Division being so structured that there would be safety in the mines. I consider that to be the reasonable interpretation of the term "political commitment" Price and Burich complain of.

The cases cited by plaintiffs do not support their contention that they have made a case of reprisal discharge.

In Retail Clerks Union, Local 648 v. Retail Clerks Int. Ass'n, 299 F.Supp. 1012 (D.D.C.1969), plaintiffs Haletsky and Kelleher were found to have been discharged as organizing directors in

retribution for their participation in the unsuccessful election contest to unseat the incumbent officers of the Retail Clerks International Association. Haletsky was the defeated presidential candidate while Kelleher failed to be elected vice president. The Court found that the election contest had been intense and many charges involving personalities and policies were made back and forth during the campaign. Both Haletsky and Kelleher as organizing directors were responsible for Union activities in major sections of the country. They had performed those duties in full conformity with Union policies. Their service had been so competent that some time prior to the election they had been made vice presidents of the Union by the very officers who at a later time they sought to defeat. And no reason was given for their discharge by those who had previously acknowledged their ability and worth.

But Price and Burich were not Haletsky and Kelleher. They were not candidates for any office in the Union; in fact, their political activity in both the 1969 and 1972 Union elections was so inconsequential as to be practically unknown. Moreover, the Miller slate had no reason to recognize any accomplishments by Price and Burich. In fact, they were officials in the Safety Division whose failures in the views of Yablonski and Miller made mine safety a principal issue in both the 1969 and 1972 election contests.

Also cited by plaintiffs is Grand Lodge of International Ass'n of Machinists v. King, 335 F.2d 340 (9 Cir. 1964). There the Court of Appeals on an interlocutory appeal had before it plaintiffs' complaint and defendants' motion to dismiss which the District Court had denied. The plaintiffs alleged that they had been discharged as officers of the defendant union because they supported an unsuccessful candidate in a union election. In affirming the District Court's refusal to dismiss the complaint, the Court of Appeals, among other things, "assume[d] * * * that defendants mean to argue that successful candidates for union office must have the right to discharge appointed union officials who expressed support for their opponents." Id. at 346.

But here defendants do not contend that because Miller was successful in the 1972 election he had the right to discharge Price and Burich for political support of Boyle. Indeed Miller and the other defendants' witnesses knew of no political activity by Price and Burich. Defendants contend that Price and Burich were discharged because they had not done and were not doing the job of protecting the life and limb of those who work in the mines. And plaintiffs have failed to prove otherwise by a preponderance of the evidence.

Nor are Price and Burich like the late Joseph Yablonski. The then President Boyle in 1969 discharged Yablonski as acting director of Labor's Non-Partisan League, a division of the Union, not because he was dissatisfied with Yablonski's discharge of those duties but in retribution for Yablonski's becoming a candidate for Union president in opposition to Boyle's candidacy. Yablonski v. United Mine Workers, (D.D.C.), 305 F. Supp. 868 (1969), 80 LRRM 3435 (1972).

In conclusion it is to be noted that Price and Burich do not claim that their union membership has been affected by any fine, suspension, expulsion or other discipline. Their sole claims are that their discharges from their respective positions in the Union's Safety Division were acts of political reprisal and therefore in violation of sections 101(a)(1), 101(a)(2), 102 and 609 of the Labor Management Reporting and Disclosure Act of 1959 (29 U.S.C. secs. 411(a)(1), 411(a)(2), 412 and 529). Price and Burich having failed to carry their burden of proving such a reason for their discharges, the complaint as to them will be dismissed. Wambles v. Teamsters, 488 F.2d 888 (5 Cir. 1974);

Witte v. Myers, 343 F.Supp. 873 (D.C. W.D.Mich.S.D.1971).

## II. Claim of Trulos

But where Price and Burich failed Trulos succeeded with his claim. I find that Trulos' discharge on January 29, 1973, was motivated by political reprisal.

Trulos is 57 years of age. He attended West Virginia University for three years where he majored in English. During World War II he worked as a welder in the shipyards. In 1959 he joined the Union and worked as a first-class welder and mechanic at a coal preparation plant. In mid-1969 he was appointed a member of the Joint Commission on Wage Rates and Classifications, a labor-industry commission which had as its purpose redefining job classifications in the coal mining industry. Prior to that, in 1967 he became chairman of his local union's information and education program. That program concerned itself with leadership development and training. During the 1969 campaign, when Boyle was running against Yablonski, Boyle made known his interest in creating a department of manpower development and education in the Union. Trulos supported Boyle's efforts and in that connection made speeches, wrote literature and otherwise campaigned for Boyle. Among other things, Trulos drew several campaign cartoons. Some of his cartoons were produced in the thousands and were distributed among workers in the locals. One of those cartoons was notorious, if for no other reason because it was in such bad taste. It depicted a pig eating from a trough. The feed bags pouring into the trough were labeled with the names of what were considered anti-union interests and from the bags flowed money. The pig depicted eating from the trough was labeled "Yablonski," who was opposing Boyle in the campaign for International President of the Union.

Following Boyle's election in 1969 (which was declared null and void by Judge Bryant in Hodgson v. United Mine Workers of America, 344 F.Supp. 17 (D.D.C.1972)), Boyle had Trulos study the kind of programs that a department of manpower development and education might undertake. In preparing himself, Trulos attended the Institute for Labor Studies at West Virginia University and he also took correspondence courses from that Institute. He also attended a labor seminar at Michigan State University. Through these activities he met and spoke with many labor educators. He visited the labor education schools of other unions, including the Steelworkers Union. In the middle of 1970 Trulos came to Washington as the Director of the Union's new Department of Manpower Development and Education. Thereafter he set up leadership and education programs for members of the union staff as well as local union leaders and the rank and file members of the union. He organized conferences, seminars and other educational programs. Those programs were appreciated and commended by those who attended.

During the 1972 campaign Trulos, like Price and Burich, was limited in political activities by Judge Bryant's order in 344 F.Supp. 17, but at least on one week-end he devoted himself to campaigning. On December 27, 1972, following Miller's installation as International President, Trulos sent Miller a memorandum describing the purposes and activities of the Department of Manpower Development and Education, to which Miller gave little attention. He requested an opportunity to discuss the program with Miller. While he never had a meeting with Miller, he did on January 2, 1973, meet very briefly with Meyer Bernstein, whom Miller appointed on December 22, 1972, Director of the Public and International Affairs of the Union. Thereafter he had no further meetings with Bernstein.

During January, 1973, he was interrogated by an Associate General Counsel of the Union. In 1972 she had been one of counsel of record for the plaintiffs in

Hodgson v. United Mine Workers of American, *supra*. She inquired of Trulos with respect to monetary contributions he had made to a Boyle fund in 1972, as well as the amount of the contributions and the form in which they were made. The Associate General Counsel also inquired of Trulos concerning his activities in the 1969 campaign. In fact, she referred to the pig cartoon heretofore mentioned. At trial she testified that the cartoon dissemination was substantial and Trulos was known to be the author. In the *Hodgson* trial Boyle testified that Trulos was the author.

Without any interest being shown by Miller or Bernstein in the programs Trulos had originated and conducted, nor any real inquiry concerning his work, he was notified on January 29, 1973, that his services were terminated as of February 1, 1973.

Defendants, in an effort to counter Trulos' claim of being a victim of political reprisal, asserted that his leadership and education programs were worthless. Bernstein spoke disparagingly of persons that Trulos had utilized in conducting those programs, but from the evidence it appears that Bernstein knew little or nothing of such persons and had no basis for such criticism. Bernstein was also critical of the very few persons reached by Trulos' programs and he compared those programs unfavorably to the Steelworkers Union labor education program, with which Bernstein himself had been associated. The Steelworkers Union program was developed over a period of years while the Miners Union's programs had only existed about two years in 1972. Moreover Bernstein gave no consideration to the fact that the operation of the Department of Manpower Development and Education was a one-man affair with limited funds. I find no justification for Bernstein's views that under the circumstances the Trulos programs were worthless. In fact, Bernstein impressed me as a biased,

prejudiced witness who had only a superficial knowledge of Trulos' programs at the time of the latter's discharge. It was Bernstein who recommended to Vice President Trbovich that Trulos be discharged. Trbovich had little or no personal knowledge of Trulos' programs.

As further evidence that Trulos' discharge resulted from political motivation is the fact that following Trbovich's presentation of Trulos' name to the International Board of the Union with the recommendation that he be discharged, which was approved, Trulos met Dick Weaver, a member of the Board, and expressed surprise that Weaver would vote to discharge him. Weaver in explanation stated that he could never forget the pig cartoon and that any time he looked at Trulos he would remember his activities with respect to Yablonski.

Ronald Lester, a local union president who supported Yablonski in 1969 in his campaign against Boyle, testified that in 1972 he and other officers of his local attended two leadership conferences conducted by Trulos. He commended the programs and stated that his local favored them. In early January 1973, before Trulos was discharged, Lester engaged in a conversation with President Miller. Among other things, Lester told Miller that Trulos had a good program and that his local both enjoyed the schooling and needed it. Lester further testified that Miller replied that Trulos' program looked good to him but that he, Miller, did not like Trulos, to which Lester responded that it was a poor excuse to throw out the program because Miller did not like Trulos.

Miller in turn testified that he could not recall any such conversation with Lester and that the latter must have been mistaken. But Miller's inability to remember his conversation with Lester fit into the pattern of a considerable part of his testimony. Page after page of the transcript finds Miller unable to remember many other events and con-

versations. I credit Lester's testimony and find that Miller liked Trulos' programs but not Trulos. And in that connection it is to be recalled that in 1969 Miller was supporting Yablonski in a hotly contested election. It is impossible to believe that Miller would forget the Yablonski pig cartoon which was so widely disseminated and so generally came to be known as one of the campaign activities of Trulos in support of Boyle.

■ Trulos' discharge did not result from his education programs or the manner in which he conducted them. It was those programs that looked good to Miller and were appreciated by those who attended them. I find that Trulos has shown by a preponderance of the evidence that he was discharged as Director of the Union's Department of Manpower Development and Education because he was the generally known creator of the pig cartoon, understandably distasteful to the supporters of the late Joseph Yablonski. And he was also known as a financial supporter of and active campaigner for Boyle. His discharge, therefore, was an act of political reprisal made unlawful by the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C., sec. 411(a)(1), 411(a)(2), 412 and 529. Grand Lodge of International Ass'n of Machinists v. King, 335 F.2d 340 (9 Cir. 1964); Retail Clerks Union, Local 648 v. Retail Clerks Int. Ass'n, 299 F.Supp. 1012 (D. D.C.1969); Yablonski v. United Mine Workers of America (D.D.C.), 305 F. Supp. 868 (1969), 80 LRMM 3435 (1972).

An order will be entered dismissing the claims of Price and Burich and entering an injunction in favor of Trulos against Miller and the Union from discharging him or otherwise harassing, intimidating or threatening him as a means of obtaining his resignation or from changing or altering his duties as Director of the Union's Department of Manpower Development and Education.