**James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,**

**and**

**Mike Trbovich, Intervenor,**

v.

**UNITED MINE WORKERS OF AMERICA, Defendant.**

**Civ. A. No. 662-70.**

United States District Court, District of Columbia.

May 1, 1972.

Order June 15, 1972.

---

See also D.C., 51 F.R.D. 270.

**20**

David Orlikoff, Paul D. Cullen, J. M. Cogbill, Dept. of Justice, Edwin Hopson, Robert Logather, John Perry, George Avery, Dept. of Labor, for plaintiff.

Jeremiah C. Collins, Belford V. Lawson, Edward L. Carey, Gen. Counsel of the UMWA, C. L. Widman, E. C. Dudley, Jr., Richard M. Cooper, Washington, D. C., for defendant.

Joseph V. Rauh, Jr., Clarice Feldman, Washington, D. C., Daniel B. Edelman, Joseph A. Yablonski, for plaintiff intervenor.

OPINION

BRYANT, District Judge.

This action was instituted by the Secretary of Labor, United States De-partment of Labor, as plaintiff, under Titles II and IV of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 401 et seq.), hereinafter referred to as the Act,[1] for a judgment declaring the election held by the United Mine Workers of America, hereinafter referred to as the defendant or the UMWA, on December 9, 1969, null and void and directing the conduct of a new election under the supervision of the plaintiff, and for an order directing and compelling defendant and its subordinate districts to maintain records as required by Section 206 of the Act (29 U.S.C. § 436).

On January 17, 1972, the United States Supreme Court granted Mike Trbovich, a member in good standing of the UMWA, leave to intervene in the Title IV aspects of this action under Rule 24(a) of the Federal Rules of Civil Procedure. Trbovich v. United Mine Workers of America, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), and he thereafter fully participated in this action, through counsel, as a party plaintiff. Defendant, an unincorporated association engaged in collective bargaining, is an international labor organization engaged in an industry affecting commerce within the meaning of the Act, and maintains a principal office at 900—15th Street, N. W., Washington, D. C., within the jurisdiction of this court.

Structurally the UMWA is a three-tiered organization composed of the International, Districts and Local unions. It has twenty-three districts and between 1290 and 1300 locals, with a total membership variously estimated to be between 193,000 and 200,000 in the United States and Canada. Of this number approximately 120,000 are actively engaged in mining coal and the remainder are retired pensioners. At the International level the president shares the responsibility of general supervision of the union with the International Executive Board. The districts are intermediate organiza-

1. Pertinent sections of the Act are attached to this memorandum as an appendix.

tions having supervision over the local unions within their geographical boundaries, thus constituting a direct link between the International and the locals, inasmuch as the International Executive Board members are chosen from the districts. Of the districts, only four are autonomous; two are semi-autonomous and the remainder are provisional districts. In autonomous districts the local union members elect both the district officers and the International Executive Board members. In semi-autonomous districts the officers are appointed by the International President and the International Executive Board member is elected by the local union members. In the provisional districts, i. e., those in trusteeship, the officers are appointed by the International President and the Executive Board members are elected by the International convention. The International President appoints the nominating committee which presents the slate of candidates for the International Executive Board to the convention, and there has never been any opposition to the slate presented to the convention by the nominating committee. Thus it appears that for all practical purposes the International Executive Board members are chosen by the president. The authority to hire and fire most of the district personnel and International representatives puts almost complete control of the entire union in the hands of the president.

On December 9, 1969 the defendant held a regularly scheduled election of International officers, i. e., president, vice-president, secretary-treasurer, auditors, and tellers. The defendant's constitution requires that the election of International officers be conducted in each of its local unions, and clearly indicates that the local union election officials are agents of the International in the conduct of the election and accountable to it for any misconduct.

W. A. "Tony" Boyle, President, George J. Titler, Vice-President, and John Owens, Secretary-Treasurer, were candidates for reelection. On May 29, 1969

Joseph A. Yablonski publicly announced his candidacy for the presidency of the union, and the subsequent election campaign was primarily a bitter confrontation between him and Boyle. The entire Boyle slate was successful, including the candidates for International auditor and credential committee and International tellers. The results of the election were: for president, Boyle 80,577, Yablonski 46,073; for vice-president, Titler 77,379, Elmer Brown 45,151; for secretary-treasurer, Owens 102,346. Owens had been unopposed for reelection.

Alleging numerous violations of the Act and also the UMWA constitution, Yablonski filed an internal challenge to the election results with the International tellers and notified the three principal officers that he intended to present his protest to the next meeting of the International Executive Board as a further step in exhausting his internal remedies as required by the Act (Section 402(a) of the Act) 29 U.S.C. § 482(a).

Joseph Yablonski, his wife and daughter were found murdered in their home on January 5, 1970.

On January 8, 1970 defendant's general counsel, acting on behalf of the defendant, requested an immediate investigation of the election by the United States Department of Labor, waiving post election exhaustion of internal remedies required by Section 402(a) of the Act (29 U.S.C. § 482(a)). After the official report of the results of the election had been issued, Mike Trbovich, a member in good standing of defendant, through counsel, filed a written complaint with the Secretary of Labor challenging the conduct of the December 9, 1969 election of officers in which he incorporated by reference the complaint filed on December 18, 1969 by Yablonski. Plaintiff, in accordance with the provisions of the Act, immediately conducted an investigation of the complaints and found probable cause to believe that violations of Title IV of the Act had occurred in the conduct of the election at all levels of the union, and had not been remedied at the time of the filing

of this action; and in addition that defendant had failed and was still failing to maintain records and to require its subordinate districts to maintain records on matters required to be reported under Title II of the Act (29 U.S.C. § 431 et seq.), which provides that labor organizations subject to the Act retain the necessary basic information and data from which documents filed with the plaintiff may be verified, explained or clarified and checked for accuracy and completeness as required by Section 206 of the Act (29 U.S.C. § 436). Thereupon this suit was filed.

One of plaintiff's principal reasons for asking that the election results be declared null and void is that the defendant used union assets to promote the candidacy of its incumbent International officers. This allegedly occurred through misuse of the union's Journal, the purchase and distribution of campaign materials, the manipulation of salary increases to its employees, and various other ways. The defendant denies any wrong doing in this regard, and claims that in most instances the matters complained of were nothing more or less than normal and traditional union activity.

## THE JOURNAL

The United Mine Workers Journal is the official publication of the UMWA and is published and distributed free semi-monthly to the entire membership by a printing company which is furnished with a mailing list for that purpose. All this is completely financed by union funds. The editor of the Journal is an experienced journalist who serves at the pleasure of the International Executive Board which in turn has full power to decide all questions concerning publication, business management and policy. Journalistic policy is subject to the direct influence of President Boyle.

The election of 1964 marked the first time in the history of the union that the International President had been challenged. At that time, though not a serious threat to Boyle, a virtual unknown named Steve "Cadillac" Kochis did run against him. Although the Yablonski candidacy did not surface until May 29, 1969, the incumbent president knew as early as February 1969 that there were two contenders for his office: the same Steve "Cadillac" Kochis, and yet another, named Elijah Wolford.

Beginning with the March 1, 1969 issue and continuing until enjoined by the issuance of a restraining order by Judge Waddy of this court on August 28, 1969, the type of coverage given to the International officers by the Journal clearly supports the charge that it was a campaign instrument for the incumbents. The issues from March 1 through June 1 are replete with speeches, statements and pictures of Boyle, Titler and Owens. The April 15 issue even carried a convention song for Tony Boyle to be sung to the tune of "Hello Dolly," the first verse of which is

"Hello Tony and Hello Johnny, and Hello to Big George Titler, too.

You're looking great fellows, We're feeling great fellows to be led by men the likes of all of you."

A none too subtle clue to the determination to use the Journal as an effective campaign sheet is revealed when we note that up to the time Yablonski announced his candidacy he had been mentioned and pictured in the Journal on several occasions. Thereafter we have an entirely different picture. Although admittedly newsworthy because of his prestigious position in the UMWA, Yablonski's announcement of his candidacy, though featured in the commercial press, was accorded not one word of mention in the Journal.

In the five issues from June 15 to September 15 there were no less than 166 references to Boyle, most of them in bold face type along with 16 pictures depicting his various activities. Again it is noted that while there were many references to Boyle's activities in support of the then pending health and safety bills, no mention was made of

Yablonski's similar activities as head of the Non-Partisan League, even though the editor of the Journal later conceded that Yablonski had been very active in the long and tedious legislative efforts to get the union's bills through the Congress. In addition there were items which extolled the extraordinary leadership capabilities of Mr. Boyle, comparing him favorably with the late John L. Lewis, and urging the membership to stand behind the officers whom Mr. Lewis personally selected to guide the destiny of the UMWA. True it is that no editorials appeared in the UMWA Journal which directly endorsed Mr. Boyle for reelection or attacked Yablonski's candidacy, but the purpose of the literal saturation of the Journal with items pointing up the day-to-day accomplishments and the great leadership potential of Boyle is clearly discernible. In determining that the Journal was used as a campaign instrument for the incumbents, and particularly as to President Boyle, this court has considered the same factors as did Judge Pratt when he granted the preliminary injunction against its continued use as such, Yablonski v. UMWA, 305 F.Supp. 868, 871 (D.D.C.1969); and draws the same line that he drew "between the use of the Journal to report the activities of defendant Boyle as President, which is permissible and the use of the Journal in such a way in reporting such activities as to promote the candidacy." Both on the grounds of comity and the evidence adduced in the trial, the court finds that the Journal was used as a campaign tool during a critical period of the election campaign, thus constituting a violation of Section 401(g) of the Act. When we take into account the widespread free distribution of the Journal as the official publication of the union to all its members—working and retired alike— the harmful effect of its misuse over a six-month period is far more than a mere possibility. It may well have accomplished its obvious purpose of affecting the outcome of the election.

## CAMPAIGN MATERIALS

On October 6, 1969, just two months before the December 9, 1969 election, and at the height of the campaign, the UMWA ordered 5,000 pens from Art Enterprises, an advertising counselling firm. The pen is a ball-point T-ball jotter with a sleeve window in the side, and when the plunger at its top is pressed the names of Boyle, Titler and Owens and the United Mine Workers appear in the window in successive order. These items cost $9,085.00 and were paid for from UMWA funds. The purchase order was placed by Howard W. Channel, the Assistant to the Secretary-Treasurer of the UMWA, who stated that he did so pursuant to instructions given to him by John Owens, International Secretary-Treasurer. The pens were similar to some which had been distributed at the 1968 convention as souvenirs and several defense witnesses insisted that the October 6, 1969 order was not for the purpose of campaigning, but solely for the purpose of fulfilling demands for additional convention souvenirs. However all of the other evidence in the case relative to this issue points to another objective.

The order was not placed until 13 months after the convention, and when Channel was asked why this was not done much earlier if the purpose was merely to fulfill demands from the field for souvenirs his only explanation was that he was following the instructions of John Owens. Additionally there was testimony that the pens were issued only to those union officials who were Boyle loyalists. William Rosser, the operator of Art Enterprises, testified that Channel asked him how long it would take to fill the order, and when told that it would take five weeks asked for delivery on a sooner date. Rosser further testified that Channel stated to him that he wanted delivery to coincide with the campaign. The pens were distributed in November during the final phase of the campaign. The timing of both the order and distribution of these pens

demonstrate the true motive for their acquisition. As a matter of fact one defense witness testified that he picked up some of them along with other campaign materials in the district office and that he used them for campaign purposes. In these circumstances the purchase of these pens constituted an improper expenditure of union funds, and thus another violation of Section 401(g) of the Act.

SALARY INCREASES

■■ Plaintiff claims that the defendant committed another violation of Section 401(g) of the Act by awarding salary increases to persons on its payroll for the purpose of securing their support for the incumbent officers. The defendant denies this accusation and contends that the salary increases were merely in conformity with a long standing UMWA tradition of increasing salaries of their union personnel as they obtain wage increases for their members from the coal operators. The circumstances surrounding the increases appear to be much more helpful to the proper resolution of this issue than the direct testimony relative to the reasons therefor.

The miners received salary increases of $1 per day on April 2, 1964, and a like amount on January 1, 1965. A salary increase of $1,000 for the officers and $600 for other employees of the union was effected on April 1, 1965, one year after the 1964 increase and three months after the one in 1965. April 1, 1965 was the day President Boyle was inaugurated for his first full term as president of the UMWA. The miners received an increase of $1 per day on April 1, 1966 and another increase of $3 per day on October 1, 1968. The officers and employees of the defendant received no increases during those years. On April 1, 1969 the administrative officers of the union received a $1,000 per year raise and the clerical staff one of $600.

Elijah Wolford had announced his candidacy for the presidency of the

UMWA on March 20, 1969, and the aspirations of Kochis for the same office were well known by that time. This April 1, 1969 increase for those on the union payroll was the first in four years, and followed the 1966 raise for the miners by three years and the 1968 raise for the miners by six months. In explanation of the obvious deviation from the alleged traditional policy of tieing union employee pay raises to wage increases obtained for the miners, Mr. Owens, defendant's secretary-treasurer, stated that the International officers were "derelict in their responsibility to give them an increase." On the same subject, Mr. Boyle testified "They (union employees) were denied the increase until the following April which was not fair but they were denied it just the same."

The miners received a $2 per day increase on October 1, 1969, and on January 22, 1970 the International Executive Board passed a resolution authorizing salary increases for officers and employees of the union to become effective as of January 1, 1970. However, the increase was not promulgated until the secretary-treasurer, Mr. Owens, sent the district secretary-treasurers a letter on April 16, 1970 authorizing the increase retroactive to January 1, 1970. This marked the first time in the history of the UMWA that a pay increase for its employees was made retroactive. It also appears to be the first time that two raises within the short span of eight months (April 1, 1969 and the one retroactive to January 1, 1970) had been effected.

The reelection campaign of Boyle, Titler and Owens was financed in part through contributions to the Miners' Committee for Boyle, Titler, Owens, 815 —15th Street, N.W., Washington, D. C. The Committee received a total of $142,-710 in contributions from 229 persons, virtually all of whom were on the union payroll in 1969. Examination of the various contributions discloses a very definite relationship between their amount and the salary bracket of the

contributors. Those in the highest bracket, i. e., International Executive Board members, district presidents and secretary-treasurers, almost invariably gave $1,000. International representatives and district representatives almost always gave $500. Some contributors conceded the relationship between their salary bracket and the amount of their contribution.

Turning to another aspect of these donations we find that those of eleven individuals employed in District 25 all arrived at the Miners' Committee's office in Washington, D. C. on October 13, 1969. The contributions of the fourteen individuals employed in District 31 arrived on September 19, 1969, and those from District 29's fourteen employees were received on September 9, 1969, and those of the nine employees of District 19 on August 13, 1969.

A similar relationship between salary and the amount of the contribution is seen in the financing of the various district-wide committees formed to support the Boyle-Titler-Owens slate. Except for two individuals in District 17 all donations to the committees operating in Districts 2, 5, 17, 25 and 31 were made by individuals on the payroll of the UMWA or of one of the districts. In each case the contributions of the district officers were significantly higher than those of the lower paid staff members. Temporary, as well as permanent employees were found on the list of contributors. One of these, a Charles Culp, testified that President Pnakovich of District 31 made it clear that his continued status on the District's payroll was contingent upon his willingness to contribute his so-called fair-share of $175 to a $5,000 personal note signed by the District's officers, the proceeds of which were used to defray campaign expenses. Pnakovich conceded that he expected all paid employees in his District to contribute to the repayment of that $5,000 and that he had made them aware of his expectations.

Shortly after the announcement of the retroactive wage increase of 1970, the political committees organized to support the Boyle-Titler-Owens slate in Districts 17, 29 and 31 repaid debts incurred by reason of their activities in the election campaign.

Defendant urges that the salary increases were justified and consistent with union policy; and that all of the campaign contributions were spontaneous and voluntary. It ascribes mere coincidence to the fact that the last two salary increases—though the first in four years—were only eight months apart and bracketed the successful election campaign of its incumbent officers. The same explanation is suggested for the marked similarity in amounts of the donations and the unusual simultaneity of their receipt from the various districts.

But these circumstances cannot be so easily discounted. All of the evidence on this issue seems to indicate that there was no tradition of salary increases for union employees paralleling wage increases obtained for the miners; or if there in fact was such a tradition, defendant completely ignored it during Mr. Boyle's regime as president. On the other hand there is a clearly indicated tie-in of the union raises, not to the wage increases for the miners, but rather to the election years for the International officers. The court finds that the defendant timed and manipulated the salary increases for the purpose of throwing them into the election year in an effort to attract the support of its employees for the incumbent officers in terms of services and financial aid. This conclusion is even more compelling when we consider these salary increases in the light of the other violations of Section 401(g) of the Act, 29 U.S.C. § 481(g), out of which emerges a demonstrated pattern of using union assets for the purpose of insuring re-election. This further violation of the Act obviously was calculated to affect the outcome of the election, and may very well have done so.

Plaintiff alleges that the defendant frustrated Yablonski in his efforts to

cover the polls with his observers, and cites this as a major violation of another section of the Act, and one which most likely affected the outcome of the election.

The UMWA constitution sets out the procedures for the nomination and election of the International officers. The polling takes place at the local unions and the officers of the locals are designated as agents of the International in carrying out the procedures set out in the constitution and the special instructions given them by the International. The officers are personally responsible for any irregularities which may take place in the local unions during the election and may be fined, suspended or expelled by the International for any transgressions. The ultimate responsibility for the conduct of the election and to see to it that the requirements of the Act are carried out rest with the International union.

Section 401(c) of the Act (29 U.S.C. § 481(c)) provides:

" . . . Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots."

Observers to oversee the conduct of the voting procedures and the counting of ballots are considered necessary in any election whether national, state, local or otherwise, and are almost invariably specifically provided for by statute or regulation or an organization's constitution. That the importance of election observers was fully appreciated by the defendant is demonstrated by the fact that the president of its District 17 sent out letters to the officers of all the locals directing them to appoint observers for Boyle.

■ As has been mentioned, the great majority of the districts were in trusteeship, with their officers appointed by the International President, as were the International representatives assigned to the district. The almost 1300 locals where the balloting was to

take place were scattered from the east coast to the Rocky Mountain region, many of them in isolated areas. In these circumstances it seems that an affirmative duty is on the International union to provide a modicum of cooperation with an adversary candidate in establishing a procedure which will give him a fair opportunity to place his observers at the polls in order that he may have the protection afforded by the Act. Otherwise, both the letter and the spirit of the Act are undercut.

■ But this cooperation was not forthcoming. Although it was known that the election was to take place on December 9, 1969, the particular site and hour of the polling was left to the discretion of each local union. Few of the locals had a regular meeting place. Communications from the International were usually addressed to the recording secretary or financial secretary. Many of the locals voted at the mine itself, which might be at some remote place many miles from the address of the local. Many mines had several portals at considerable distances from each other and as many as three shifts, so that there could be any combination of times and places for voting. Obviously no candidate could hope to recruit several thousand observers and get them prepared to be at their stations unless he was assured that he would have some means of determining in advance of election day the time and place of the polling at the various locals.

Yablonski could not obtain the addresses of the various locals from the International, nor was he given any information as to the polling places of the 1964 election which might have been helpful in determining where the polling places for the current election might have been. Finally he decided to write directly to the locals requesting that they inform him of the time and place of the voting. On October 30, 1969 Yablonski delivered to the office of the International union envelopes to be mailed to all local unions. Each envelope contained a form letter addressed to the recording

secretaries, and local union officers with a self-addressed post card. The letter requested that the time and place of the balloting be entered on the self-addressed post card and the card be returned. The envelopes were delivered to the International headquarters where an assistant to the secretary-treasurer addressed and mailed them to the local unions. Of 1299 letters and post cards sent out to the locals, only about 300 were returned to Yablonski. By his own efforts and those of his associates Yablonski was able to discover approximately 200 additional polling places. Thus at the time of the election he had between fifty and sixty percent of the total number of locals covered by observers.

When an officer of one of the locals called the general counsel of the UMWA and inquired as to whether he should fill out and return the post card which had been requested by Yablonski, he was told that the United Mine Workers of America took no position on the matter and that he should use his own judgment. The failure and refusal of the UMWA to assume any responsibility for providing sufficient information to Yablonski for him to avail himself of the opportunity to cover the polls with observers constitutes a flagrant violation of the Act which may have had an effect on the outcome of the election.

█ Plaintiff claims that Yablonski's removal from the directorship of Labor's Non-Partisan League was a reprisal action for his candidacy and thus a flagrant violation of Section 401(e) of the Act (29 U.S.C. § 481(e)).

On April 17, 1969 President Boyle appointed Yablonski as Acting Director of Labor's Non-Partisan League, a division of UMWA, effective May 1, 1961. The League is the legislative arm of the union and its principal function is to lobby for legislation favored by the union. The Director of the League is an important and prestigious position, and this was especially true at the time in question because there was then pending in Congress legislation providing for increased safety measures in the mines.

On June 6, 1969, scarcely a week after his announcement as a candidate, and without any prior warning or notice, Yablonski was removed from his position as Acting Director of Labor's Non-Partisan League by his election opponent, Boyle, and ordered to report and work under the direction of a subordinate officer, Michael Budzanoski, President of UMWA District 5, and a leading Boyle loyalist. This was accomplished by a letter from Boyle to Yablonski in which the assertion was made that the latter was "unable to spend more than an hour or so a day on the job." Boyle refused to respond to several letters of inquiry from Yablonski relative to his dismissal, and at a June 23, 1969 meeting of the International Executive Board obtained approval of his action in relieving Yablonski from his position, but on the entirely different ground that Yablonski had issued a public statement in which he opposed union policies regarding certain mine safety regulations. Shortly thereafter Yablonski brought suit in this court for an injunction to restrain Boyle from relieving him from his position as Acting Director and reinstate him to the same. During the course of that litigation, in response to an inquiry relative to Boyle's firing and transferring Yablonski without notice or warning, Boyle stated, "Mr. Yablonski was on notice, plenty of notice. He gave his own warning on May 29." This was the day when Yablonski announced his candidacy. In the reinstatement suit, which was heard by Judge Corcoran, the defendant union maintained that Yablonski was removed because he favored tougher and stronger mine health and safety legislation than the defendant and its officers advocated for tactical reasons. During the course of the instant trial, the defendant through its officers, advanced a wholly inconsistent reason for the discharge, i. e. that Yablonski favored weaker legislation than defendant.

This record clearly demonstrates that Yablonski's removal and transfer came about as a direct reprisal for his running for president of the union against

Boyle, and thus was a violation of the Act.

It is true that Judge Corcoran ordered that Yablonski be restored to his position; but the Act clearly had been violated, and in a fashion which served notice of what might be expected on all officers, employees, and members of the defendant union who might have been Yablonski supporters, but who were also vulnerable to similar reprisals because of the immense power residing in Mr. Boyle. This is the type of violation which very well may have affected the outcome of the election.

■■ Plaintiff charges that the defendant committed numerous violations of Section 401(g) of the Act at the District level by the use of union personnel, funds and facilities in support of its incumbent officers; and emphasizes the potential of these abuses for affecting the outcome of the election by pointing up the importance of the Districts in the overall structure of the organization.

Union funds in the amount of $8,000 were transferred to an attorney by the officers of District 2. It appears that at the time this money was not due and owing to him on account of any services rendered to the District or the UMWA, and that it was transferred by him to the Volunteers Committee for Boyle, Titler and Owens established in District 2.

District 5 is in Pittsburgh, Pennsylvania, and its president is Michael Budzanoski. The District is not financially self-sustaining, and money is borrowed from the International union to cover the expenses which exceed its income. There has never been a problem in obtaining money from the International for its activities and during 1969 large sums were made available to it. Some of the union's money was channelled through the District's treasury to the District's Committee for Boyle, Titler and Owens via a false voucher scheme originated by Budzanoski.

Also voluminous campaign literature was prepared, stored in and distributed from the District headquarters. The campaign committee had no address other than that of the District at 938 Pennsylvania Avenue, Pittsburgh, Pennsylvania 15272.

R. R. Humphreys was the president of District 17 and a Mr. Howell was district representative. In response to a number of inquiries by local union officers with respect to Yablonski's request to be advised of the time and place of the election in their locals, Howell advised them that it was strictly a local union matter and not the concern of the District. By way of contrast on November 26, 1969 Humphreys sent a letter on his official stationery to all local union presidents and recording secretaries in District 17. That letter, typed at the District headquarters by a paid employee of the District on one of its typewriters and thereafter mailed at the District's expense, read in part as follows:

It is very important and essential that your local union, in addition to the regular tellers, have an observer representing Messrs. Boyle, Titler and Owens. These observers are supposed to sit in the polling place and watch the observers for the other candidates to see that no one does anything wrong. The observers are not there to watch the officers; they are there to watch the members voting. Under the Landrum-Griffin Law, ALL candidates have a right to a poll watcher. Be sure to keep the name of each poll watcher and the party he represents. This is very important. Also, these watchers *do not* have to be members of the Union.

On November 30, 1969, a little over a week before the election, District 23 spent its funds in sponsoring a political rally in Madisonville, Kentucky. Though billed as one of the many Black Lung rallies, it obviously was mainly for political purposes, with a short period devoted to a discussion of the safety issues and, after a brief intermission during which the main participants did not even leave the stage, a full blown campaign rally. It was featured by Boyle

making an extensive attack on Yablonski. In addition the District office was used as a depository for the incumbents' campaign materials.

District 27 is a provisional district tionery and the preparation of membership lists in order to complete a mass mailing of campaign literature in support of Boyle, Titler and Owens.

District 28 is a provisional district with 51 locals under its jurisdiction and its president is Carson Hibbitts. Hibbitts helped form a committee of all the employees of the District whose purpose was the reelection of the International officers. Meetings of the committee were held in the District office and campaign literature was prepared in, stored in and distributed from the same.

On June 26, 1969 a letter on the letterhead of the UMWA, Carson Hibbitts, President, District No. 28, was addressed to "All officers and members of all local unions, District 28, United Mine Workers of America." The letter was signed "Carson Hibbitts, President, District 28" and "Ray Thornbury, International Representative." Hibbitts admitted that it bore his signature.

A portion of the letter reads:

In addition to this, District 28 has set up a voluntary organization for the reelection of our International officers W. A. Boyle, George J. Titler, and John Owens. These men have the proven ability to successfully lead our union in the future as they have in the past. This newly organized group will in the very near future send out information to each and every member pertaining to the record of some of the people who are out to destroy our union.

The time has come for our members to back our union against the people who are out solely for the purpose of destroying the greatest union on earth, the United Mine Workers of America, along with our present International President, W. A. Boyle, who is being attacked viciously as John L. Lewis was some twenty-five years ago.

This is clearly an official letter from District 28 carrying a vigorous endorsement of the incumbent International officers.

In the late summer of 1969 Thornbury and a number of members of District 28 locals went to Pittsburgh, Pennsylvania, to meet with Michael Budzanoski and Robert Gordon of District 5 and hear them discuss Yablonski's background and lack of qualifications to be president. On August 7, 1969 the District issued checks to some of those attending the meeting at Pittsburgh which included a reimbursement for lost wages as a result of their attendance.

Carson Hibbitts was also president of District 30, another provisional district during the campaign period. The evidence establishes that between May 29 and December 9, 1969 office personnel and facilities, including storage space, office equipment and supplies, were used to promote the candidacy of the incumbent officers.

The president of District 31, Leonard J. Pnakovich, ordered the staff of the District to participate in the organization of the Boyle-Titler-Owens campaign headquarters. The District office was used as a meeting place for campaign purposes and for the storage and distribution of literature, and a portion of the District's funds were also spent to finance the campaign committee.

The UMWA constitution places the districts in a most important role as supervisors of local union affairs. They settle locals' grievances with employers; they have the power to reverse actions of locals; they can call strikes, regulate unauthorized work stoppages, regulate transfer cards, etc. The individual miner is ever aware of its presence. In these circumstances no district officer or employee should in his official capacity attempt to influence an election of International officers. No restriction is placed against their supporting and campaigning for candidates of their choice, just so long as they act as individuals on their own time; but any campaign activity engaged in by them in their offi-

cial capacities in favor of any particular candidate, or the use by such individuals of district funds or facilities constitutes a gross violation of Section 401(g) of the Act. (29 U.S.C. § 481(g)).

Plaintiff has established such violations and they are particularly serious in this case inasmuch as most of the Districts are in trusteeship where the officers are appointees of the International President and personally responsible to him. In addition they may have affected the outcome of the election.

■ Widespread and varied misconduct is alleged to have occurred at the local union level; and plaintiff contends that the nature and frequency of the proven misconduct establishes the existence of a pattern and practice throughout the locals.

The most serious of the claimed violations among the locals appear to be a) voting by non-secret ballot, b) campaigning within the polling area, and c) interference with the lawful activity of Yablonski's observers.

The evidence shows that in a great number of defendant's local unions little regard was shown for the requirement that the election be had by a secret ballot. Frequently ballots were marked on walls, chairs, window sills, the backs of other voters, and other places other than a polling booth. Sometimes this occurred under crowded conditions with members voting at the Tellers' table in plain view of officials and observers, or in groups at the same table or elsewhere in the polling place. These conditions, according to plaintiff, made it possible for voters to see how other voters marked their ballots. The defendant on the other hand contends that any body who cared to cast his vote in secrecy could have exercised enough ingenuity to accomplish his purpose.

These loose polling procedures fall short of the Act's specific requirement, and also seem at odds with what has come to be regarded generally as a minimum requirement of the democratic process and free elections.

The record does establish that the defendant allowed campaigning in a substantial number of polling places during the conduct of the election. This practice was widespread. The most prevalent method of campaigning was effected by Boyle partisans through the use of Boyle slate sample ballots and other literature. According to this evidence this literature, and in particular the sample ballots, appeared in various places in the polling places, including the Tellers' tables, on bulletin boards, in the voting booths and on tables at the entrance to the polling place. In many instances they were passed out to voters by the Tellers themselves or Boyle workers within the polling area.

■ The defendant has characterized the sample ballot issue as a "red herring" of mammoth proportions. It insists that sample ballots are ordinary electioneering materials recognized as perfectly valid by nearly all election regulations. But in taking this view defendant obviously oversimplifies the matter. No one contends that such materials are not acceptable or that their use is illegal or unfair—except within the polling area. Almost universally active campaigning is restricted to a certain distance away from the entrance to the polls, and election officials are instructed to vigorously enforce this regulation.

The defendant insists that the sample ballot was not improperly used, and even cites the applicable District of Columbia regulation which provides: "A voter may take sample ballots or such other materials as he may desire into the voting booth." (D.C. Rules & Regulations, Title 37, § 5.5(c) 1970). But another section of the same regulations, § 5.8(b), provides:

Interference With Conduct of Elections. No partisan or nonpartisan political activity, or any other activity which in the judgment of the Team Captain may directly or indirectly interfere with the orderly conduct of the election, shall be permitted in, on, or within a reasonable distance outside the building used as a polling or vote

counting place. The distance deemed "reasonable" shall be approximately 50 feet from any door used to enter the building for voting. The exact distance will be determined by the Polling Team Captain depending on the physical features of the building and surrounding area. A description of limits for political activity for each polling place shall be available for public inspection at the office of the Board at least twenty-four hours in advance of the opening of the polls. Wherever possible, the limit shall also be indicated by a chalk line or by some other physical marker at the polling place. The term "political activity" shall include without limitation any activity intended to persuade a person to vote for or against any candidate or to desist from voting.

And the same regulations impose the duty upon the Voting Supervisors to " . . . Remove sample ballots and trash from each vacant booth; and prevent voters from communicating with each other in the voting booth area."

The sample ballot per se is not offensive, but its improper usage cannot be condoned.

There is evidence tending to prove that in many cases Yablonski's observers were thwarted in their activities. In some cases they were held waiting for alleged clearance before performing their duties, and in others they were confined to spots in the polling area which made effective observation impossible.

It appears that these matters complained of at the local level did constitute violations of the Act. It should be remembered that "Congress' model of democratic elections was political elections in this country . . . " Wirtz v. Hotel, Motel and Club Employees, 391 U.S. 492, 504, 88 S.Ct. 1743, 1750, 20 L.Ed.2d 763.

█ The court is certain that all of the violations discussed herein have been established by the standard of proof required by the statute, and it is equally certain that when viewed in the light of the Supreme Court's discussion of the "may have affected" language of the Act (Section 402(c), 29 U.S.C. § 482(c)), Wirtz v. Hotel, Motel and Club Employees, 391 U.S. 492, 505–509, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968), the violations may have affected the outcome of the election.

This is true as to any one of the violations on the International level, and also as to some of those ascribed to the Districts, e. g. 163,000 copies of an election bulletin were prepared and distributed to the entire union membership by Budzanoski in District 5. And those violations proven to have occurred within the locals, when viewed in the light of those at the higher levels of the union, could well have the cumulative effect of determining the outcome.

In the face of the evidence presented by the plaintiff * the defendant has fallen far short of producing evidence which supports a finding that the violations did not affect the election result. Defendant, of course, urges a contrary view and takes the position that this result should not be disturbed.

Throughout the course of this litigation the court has been ever sensitive to the fact that the Act is not designed to deprive labor unions of control over their own affairs and have then supervised by the courts and any other governmental agency. But in order to reach the defendant's position the court would be forced to swim upstream against the tide of evidence too strong to resist.

### Second Cause of Action

█ On April 13, 1971 the court granted the Secretary of Labor's motion for a preliminary injunction compelling the defendant to comply with the record-keeping requirements of Section 206 of the Act (29 U.S.C. § 436). At that time the court found as a fact that defendant, while presenting evidence of corrective measures taken with regard to record-keeping as to certain types of disburse-

* All references to the plaintiff are meant to include the Intervenor Plaintiff.

ments, had not demonstrated that corrective measures had been taken with respect to all of the record-keeping deficiencies found to exist by the court, and the likelihood of further violations was not entirely eliminated, and concluded as a matter of law that the granting of a preliminary injunction compelling defendant to comply with Section 206 of the Act (29 U.S.C. § 436) was appropriate in light of the defendant's past record-keeping conduct as found by the court, and its inability to guarantee compliance in all respects in the future. This was after a finding that certain record keeping procedures were violative of Section 206 of the Act.

At the preliminary injunction hearing the defendant had the burden of showing that corrective measures had been taken and failed to do so. No evidence on this score was presented during the trial. Therefore the court finds that the defendant is still in violation of the Act and accordingly concludes that the injunction prayed for under Title II of the Act should be made permanent.

This memorandum opinion shall constitute the court's findings of fact and conclusions of law. Counsel will submit an appropriate order.

## APPENDIX

### *Statutory Provisions*

Section 3(d) of the Act (29 U.S.C. § 402 (d)):

"Person" includes one or more individuals, labor organizations, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in bankruptcy or receivers.

Section 3(i) of the Act (29 U.S.C. § 402 (i)):

"Labor organization" means a labor organization engaged in an industry affecting commerce and includes any organization of any kind, any agency, or employee representation committee, group, asso-

ciation, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization, other than a State or local central body.

Section 3(j) of the Act (29 U.S.C. § 402 (j)):

A labor organization shall be deemed to be engaged in an industry affecting commerce if it—

(1) is the certified representative of employees under the provisions of the National Labor Relations Act, as amended, or the Railway Labor Act, as amended; or

(2) although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

(3) has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

(4) has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

(5) is a conference, general committee, joint or system board, or joint counsel, subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection, other than a State or local central body.

Section 206 of the Act (29 U.S.C. § 436):

Every person required to file any report under this title shall maintain records on the matters required to be reported which will provide in sufficient detail the necessary basic information and data from which the documents filed with the Secretary may be verified, explained or clarified, and checked for accuracy and completeness, and shall include vouchers, worksheets, receipts, and applicable resolutions, and shall keep such records available for examination for a period of not less than five years after the filing of the documents based on the information which they contain.

Section 210 of the Act (29 U.S.C. § 440):

Whenever it shall appear that any person has violated or is about to violate any of the provisions of this title, the Secretary may bring a civil action for such relief (including injunctions) as may be appropriate. Any such action may be brought in the district court of the United States where the violation occurred or, at the option of the parties, in the United States District Court for the District of Columbia.

Section 401(a) of the Act (29 U.S.C. § 481(a)):

Every national or international labor organization, except a federation of national or international labor organizations, shall elect its officers not less often than once every five years either by secret ballot among the members in good standing or at a convention of delegates chosen by secret ballot.

Section 401(c) of the Act (29 U.S.C. § 481(c)):

Every national or international labor organization, except a federation of national or international labor organizations, and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate with respect to the use of lists of members, and whenever such labor organizations or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution. Every bona fide candidate shall have the right, once wtihin 30 days prior to an election of a labor organization in which he is a candidate, to inspect a list containing the names and last known addresses of all members of the labor organization who are subject to a collective bargaining agreement requiring membership therein as a condition of employment, which list shall be maintained and kept at the principal office of such labor organization by a designated official thereof. Adequate safeguards to insure a fair election shall be provided, including the right of any candidate to have an observer at the polls and at the counting of the ballots.

Section 401(e) of the Act (29 U.S.C. § 481(e)):

In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates or his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof. Not less than fifteen days prior to the elec-

tion notice thereof shall be mailed to each member at his last known home address. Each member in good standing shall be entitled to one vote. No member whose dues have been withheld by his employer for payment to such organization pursuant to his voluntary authorization provided for in a collective bargaining agreement shall be declared ineligible to vote or be a candidate for office in such organization by reason of alleged delay or default in the payment of dues. The votes cast by members of each local labor organization shall be counted, and the results published, separately. The election officials designated in the constitution and bylaws or the secretary, if no other official is designated, shall preserve for one year the ballots and all other records pertaining to the election. The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this title.

Section 401(g) of the Act (29 U.S.C. § 481(g)):

No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this title. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.

Section 402(a) of the Act (29 U.S.C. § 482(a)):

A member of a labor organization—

(1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or

(2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation,

may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of section 401 (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide.

Section 402(b) of the Act (29 U.S.C. § 482(b)):

The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this title has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization as an entity in the district court of the United States in which such labor organization maintains its principal office to set aside the invalid election, if any, and to direct the conduct of an election or hearing and vote upon the removal of officers under the supervision of the Secretary and in accordance with the provisions of this title and such rules and regulations as the Secretary may prescribe. The court shall have power to take such action as it deems proper to preserve the assets of the labor organization.

Section 402(c) of the Act (29 U.S.C. § 482(c)):

If, upon a preponderance of the evidence after a trial upon the merits, the court finds—

(1) that an election has not been held within the time prescribed by section 401, or

(2) that the violation of section 401 may have affected the outcome of an election,

the court shall declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the con-

stitution and bylaws of the labor organization. The Secretary shall promptly certify to the court the names of the persons elected, and the court shall thereupon enter a decree declaring such persons to be the officers of the labor organization. If the proceeding is for the removal of officers pursuant to subsection (h) of section 401, the Secretary shall certify the results of the vote and the court shall enter a decree declaring whether such persons have been removed as officers of the labor organization.

Section 601 of the Act (29 U.S.C. § 521):

(a) The Secretary shall have power when he believes it necessary in order to determine whether any person has violated or is about to violate any provision of this Act (except Title I or amendments made by this Act to other statutes) to make an investigation and in connection therewith he may enter such places and inspect such records and accounts and question such persons as he may deem necessary to enable him to determine the facts relative thereto. The Secretary may report to interested persons or officials concerning the facts required to be shown in any report required by this Act and concerning the reasons for failure or refusal to file such a report or any other matter which he deems to be appropriate as a result of such an investigation.

(b) For the purpose of any investigation provided for in this Act, the provisions of sections 9 and 10 (relating to the attendance of witnesses and the production of books, papers, and documents) of the Federal Trade Commission Act of September 16, 1914, as amended (15 U.S.C. 49, 50), are hereby made applicable to the jurisdiction, powers, and duties of the Secretary or any officers designated by him.

## ORDER

The issues in this cause having been tried before the court without a jury, the evidence of all parties hereto having been heard, and the court having entered an opinion on May 1, 1972 constituting its findings of fact and conclusions of law, it is this 15th day of June, 1972,

Ordered, adjudged, and decreed as follows:

1. The December 9, 1969 election of International officers in defendant United Mine Workers of America, hereinafter referred to as the International, is declared null and void pursuant to Section 402 of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 482.

2. The International shall hold nominations for and conduct an election of all International offices by secret ballot among its members in good standing under the supervision of the Secretary of Labor and under such rules and regulations as the Secretary of Labor may prescribe and in accordance with the provisions of Title 4 of the LMRDA (29 U.S.C. § 481 et seq.). The election shall be concluded by January 1, 1973, and the results thereof shall be subject to the certification of the Secretary of Labor by January 15, 1973; and the individuals thereafter declared by this court to be the lawfully elected officers of the defendant shall serve full constitutional terms of office from the date of their installation.

3. The International, its officers, agents and employees are hereby restrained and enjoined from conducting an International Convention until the results of the supervised election are certified to this court by the Secretary of Labor and this court enters its decree declaring such persons to be the duly elected officers of the International.

4. From the date of this order until the installation of the duly elected officers pursuant to paragraph 2 of this order, the individuals now holding office pursuant to the election of December 9, 1969 shall continue to conduct the affairs of the defendant union. The internal affairs of the defendant union shall be subject to the direct supervision of the Secretary of Labor and shall be subject to such further orders from this court as are from time to time required.

5. From the date of this order until the date this court enters an order declaring the election of individuals certified by the Secretary of Labor as the elected officers in the supervised election the Secretary of Labor shall have the authority to place a representative at International headquarters in Washington, D. C. with the specific authority to disapprove any financial transaction of the International; and all books and records of the International shall be made immediately available to the Secretary's representative upon his demand.

6. During the same period of time mentioned in the preceding paragraph the Secretary shall have the authority to place a representative in each of the International's District and Sub-District offices who will have the same power and authority as that of the Secretary's representative at the International headquarters.

7. During the same period of time the Department of Labor shall have the authority to oversee the financial transactions made by any or all of the defendant's local unions, and upon demand the books and records of any such local union shall be made available to representatives of the Secretary of Labor for audit.

8. During the same period of time mentioned in the preceding paragraph of this order plaintiff-intervenor is authorized to maintain an observer whereever the Secretary of Labor has authority to place a representative. This observer shall not participate in the conduct of the internal affairs of the union, but shall be fully informed of such activity as it occurs.

9. The dates, times and places of the nominations and election meetings in the defendant's local unions shall be subject to the approval of the Secretary of Labor.

10. The International shall by June 25, 1972 prepare a list of all local unions and the names and addresses of the principal officers of each local union. A copy of this list shall be given to the Department of Labor immediately upon completion thereof and shall be given by the defendant to any bona fide candidate for office upon demand.

11. The International shall, by July 10, 1972, prepare a current membership list including the addresses of all members. A copy of this list shall be given to the Department of Labor immediately upon completion thereof, and shall be made available by the Secretary of Labor to any bona fide candidate for office upon demand, but under such conditions and provisions as are deemed by the Secretary necessary to restrict its use to purposes of the supervised election. Noncompliance with any such condition or the use of this list by any one for any other purpose is expressly forbidden by the terms of this order.

12. Commencing with the July 1, 1972 issue of the UMWA Journal up to and including the last issue prior to the supervised election, equal space for the presentation of news concerning, and the political views of bona fide candidates will be made available in each issue under a format subject to the approval of the Secretary of Labor. Slates of candidates may combine their allotted space and present their views as a slate.

13. No person who is an officer or employee of the International union or any District shall be allowed to make any financial contribution directly or indirectly to the campaign of any candidate or nominee. No person shall participate or aid or abet in any scheme to evade this proscription. This proscription, however, does not apply to a candidate making expenditures of his own funds on his own behalf. Every candidate or nominee shall make a report to the Secretary of Labor on the first day of each month detailing all contributions received and expenditures made, as of that date, in support of his candidacy for office. Such reports shall separately state donor and amount as to every contribution received for the candidate or nominee or by any other person or com-

mittee on his behalf, including contributions made by the candidate or nominee himself. A copy of each such statement shall be filed contemporaneously with the Secretary of Labor and shall be made available for inspection and copying by any other bona fide candidate or nominee or his representative.

14. During the period from the entry of this order until completion of balloting in the supervised election, each employee of the union shall file with the appropriate representative of the Secretary of Labor on the first and fifteenth day of each month a statement reporting his activities and accounting for his time and expenses. Such statements shall be made available to any candidate upon request.

15. During the period from entry of this order until completion of balloting in the supervised election, no loan from the International union to any district may be made without a sworn statement from the district demonstrating its need for the loan in relation to valid union purposes. Copies of the statement shall be furnished to the representative of the Secretary assigned to the district seeking a loan, to the plaintiff intervenor's observer, and to counsel in this cause. No such loan may be made without satisfactory statement of purpose, nor absent an adequate showing of evidence of need on demand of the Secretary.

16. During the period from the entry of this order until completion of balloting in the supervised election no new personnel, whether full-time or part-time, shall be hired by the International or any district union without a sworn statement from the International or district proposing to hire such person. Such statement shall contain the person's proposed job title, number of hours per week and salary. In addition the statement shall include a full description of the person's proposed union duties and a showing that such work cannot be performed by existing personnel. Copies of such statement shall be furnished to the appropriate representative of the Secre-

tary, to the plaintiff-intervenor's observer, and to counsel in this cause. No person shall be hired without an adequate statement, nor absent an adequate showing, on the Secretary's demand, of need for the person's services. Each new employee hired by the International union or any district during this period shall file with the appropriate representative of the Secretary a statement on the first and fifteenth day of each month reporting his activities and accounting for his time and expenses. Such statement shall be made available to any candidate upon request.

17. The Secretary of Labor shall enter into negotiations with the government of Canada to assure that the election in the UMWA districts located in Canada shall be conducted according to the guidelines established herein and under the same procedures and with the same safeguards as the election in the districts in the United States. Defendant UMWA is ordered to direct its districts in Canada and their officers, employees, and representatives to comply fully with this order and with the election requirements of its Constitution and LMRDA and to cooperate with the Canadian officials designated to oversee the election. Failure of the UMWA to assure compliance in the Canadian districts with this order and LMRDA and to cooperate with the Secretary and the designated Canadian officials in those districts may result in the voiding of the ballots from those districts.

18. The Opinion issued by this court in this case on May 1, 1972, and this Order shall be printed in their entirety in the July 1, 1972 issue of the United Mine Workers Journal.

It is further ordered, adjudged and decreed:

a. That the defendant, its officers, employees, agents, attorneys and representatives are permanently enjoined from repetition of the violations found to have occurred by this court's opinion of May 1, 1972.

**38**

b. That the defendant, its officers, agents, employees, attorneys or persons acting in concert and participation with said persons be and the same hereby are permanently enjoined and restrained from violating the record keeping provisions of Section 206 of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 436); and in particular the defendant, its agents, employees, attorneys and all persons acting in concert and participation with said persons shall:

(1) retain and maintain all vouchers, worksheets, receipts and applicable resolutions pertaining to each disbursement of defendant's funds sufficient to provide verification in the records of each said disbursement to the ultimate recipient, said records to contain the date and purpose of the disbursement, signature or bill submitted by the ultimate recipient and authorization for disbursement, where necessary and appropriate; except where any per diem allowance, properly authorized in writing, is in effect so as to cover certain expense account expenditures;

(2) retain and maintain sufficient records as to all financial transactions between the International and the districts so as to reflect in the records the amount transferred to each district, the amounts repaid, if any, and the arrangements, if any, as to when and how repayments are to be made by each district; and

(3) retain and maintain all such records on the matters required to be reported under Title II of the Act (29 U.S.C. § 431 et seq.) contemporaneous with the transactions.

This court shall retain jurisdiction of this cause in order to provide such further relief as may be necessary to effectuate the purposes of this order.

Nothing herein shall prejudice the right of any party hereto to file an application for attorneys' fees, expenses or costs.