Thomas **FITZGERALD**, a New Jersey Citizen, et al., Plaintiffs,

v.

The **NATIONAL RIFLE ASSOCIATION OF AMERICA**, a New York corporation, **Defendant.**

Civ. A. No. 772–73.

United States District Court, D. New Jersey.

Sept. 23, 1974.

Irwin & Post by Charles J. Irwin, Newark, N. J., for the plaintiffs.

Shanley & Fisher by Thomas F. Campion, Newark, N. J., for defendant.

## OPINION AND ORDER

WHIPPLE, Chief Judge.

Plaintiffs have petitioned this Court for an Order requiring the defendant, National Rifle Association of America, (NRA), to publish certain advertising in *The American Rifleman*, NRA's official journal. On behalf of Fitzgerald, plaintiffs submitted an advertisement concerning Fitzgerald's candidacy for the NRA's Board of Directors, which defendants refused to publish.

The 75 member Board consists of, and is elected by, so-called "life members" of the NRA. There are approximately 146,000 members in this category, while "annual members" number more than 800,000. Annual members are not eligible to vote for the Board of Directors, but may make recommendations to a "Nominating Committee" which selects candidates for the election.

The Nominating Committee is selected by the president of the NRA, who is elected by the members of the Board of Directors. As noted above, this Committee, which is comprised of life members, engages in the process of nominating candidates for the Directors' election. NRA By-laws also provide for a write-in ballot in this election.

In an effort to gain nomination, plaintiff Fitzgerald first became a life member by paying the necessary fee. He then sought support from the membership by means of an advertisement in *The American Rifleman*.

Upon receipt of the proffered ad, with which proper payment was tendered, the NRA advised that the material was unsuitable for publication. On its advertising rate card, the NRA states that it "reserves the right to reject or discontinue any advertisement and to edit all copy."

The defendant justifies its refusal to publish the plaintiffs' advertisement by citing an impressive list of precedents upholding the right of a newspaper or magazine to refuse to accept for publication any advertisement submitted to it by a prospective advertiser.[1] The discretion afforded publishers to deny space to those seeking to buy it is premised on the characterization of newspapers as private enterprises, rather than as businesses clothed with a public interest.

■■ Accordingly, a newspaper publisher is generally free to contract and deal with whomever he chooses in the same manner as other businessmen. *See* J. J. Gorden, Inc. v. Worcester Tel. Publishing Co., 343 Mass. 142, 177 N.E.2d 586 (1961). This Court has no quarrel with this principle and recognizes the general right of a newspaper or magazine to decide what advertisements it will and will not accept. It is the Court's view, however, that this rule is not absolute in all circumstances. Like the vast majority of legal rights and privileges, the right here in question must yield when its exercise would result in the curtailment of another right of even greater social importance.

The United States Supreme Court has recognized the qualified nature of the publisher's right to refuse advertisements. In Loraine Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), the Court faced the question of whether a newspaper could refuse advertising when its purpose was the monopolization of interstate commerce. In discussing the issue, the Court noted:

> The publisher claims a right as a private business concern to select its customers and to refuse to accept advertisements from whomever it pleases. We do not dispute that general right. "But the word 'right' is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified." American Bank & Trust Co. v. Federal Reserve Bank, 256 U.S. 350, 358, 41 S.Ct. 499, 500, 65 L.Ed. 983. The right claimed by the publisher is neither absolute nor exempt from regulation.

*Id.* at 155, 72 S.Ct. at 187.

The Court concluded that when balanced against the Congressional policy of preventing monopoly, the right of publishers to refuse advertisements must yield.

The publisher's right of refusal was also forced to yield to a countervailing right in Hodgson v. United Mine Workers of America, 344 F.Supp. 17 (D.D.C. 1972). Significantly, the countervailing interest in *Hodgson* was the right of union members to a fair election under the Labor Management Reporting and Disclosure Act, 29 U.S.C.A. § 481 *et seq.*

■ In the instant case, this Court must decide whether the publisher's right must give way when balanced against the fiduciary duty of corporate directors to insure fair and open corporate elections. This duty of course extends only to the association membership. Plaintiffs Fitzgerald and Abelman are members in good standing of the NRA and thus qualify to bring this issue to the Court's attention. The third plaintiff, NRA Members for a Better NRA, is not now, nor has it ever been, affiliated with the NRA in any way. As to this plaintiff,

1. *See, e. g.,* Approved Personnel, Inc. v. Tribune Co., 177 So.2d 704 (Fla.Dist.Ct.App. 1965); Shuck v. Carroll Daily Herald, 215 Iowa 1276, 247 N.W. 813 (1933); Pough-keepsie Buying Service, Inc. v. Poughkeepsie Newspapers, Inc., 205 Misc. 982, 131 N.Y.S.2d 515 (Sup.Ct.1954).

therefore, all relief is denied. All future references to plaintiffs in this Opinion apply only to Messrs. Fitzgerald and Abelman.

At the outset it is important to note that *The American Rifleman* is the official journal of the NRA. As such it is neither published for, nor circulated to, the general reading public. The Court takes judicial notice that the *Rifleman* is available only to NRA members. It is not sold at newsstands, nor are subscriptions accepted from non-NRA members. The magazine's publishing costs are met through NRA membership dues, as well as through the acceptance of advertising. In addition to containing articles of general interest to gun enthusiasts, the *Rifleman* is used to acquaint NRA members with the policies and activities of the association.

Finally, it should be pointed out that the *Rifleman* is an integral part of the NRA's election process. Once the nominating committee has selected its list of candidates for office, the list is published in the *Rifleman*. Voters then must refer to the *Rifleman* in order to exercise their franchise.

This special relationship between the NRA and *The American Rifleman* indicates that the *Rifleman* is closer in form to a corporate newsletter than to a traditionally commercial publication such as *Time* or *Newsweek*. Indeed in the instant case, traditional distinctions between a publisher and an advertiser become blurred, since the plaintiffs may justifiably claim an ownership interest in the *American Rifleman*. Plaintiffs are members in good standing of the association which publishes the magazine and their dues go in part to meet the magazine's printing costs.

■ The NRA itself is organized under the laws of the State of New York pursuant to that state's Not-For-Profit Corporation Law § 101 *et seq.* (McKinney's Consol.Laws, c. 35, 1970) [hereinafter N.P.C.L.]. Like all corporate directors and officers, the management of the NRA owes a fiduciary duty to its stockholders (in this case the association's membership) to conduct the NRA's affairs in a good faith effort to promote the best interests of the association. In the case of the NRA, this common law duty is augmented by Section 717(a) of the N.P.C.L., which provides in part:

Directors and officers shall discharge the duties of their respective positions in good faith . . . .

Because of the special relationship between the NRA and *The American Rifleman*, it is this Court's view that the fiduciary obligations of the association's directors and officers applies with equal vigor to the operation of *The American Rifleman*.

■ As part of their overall fiduciary relationship with the stockholders, it is well established that the directors and officers cannot manipulate the affairs of the corporation primarily with the intent of securing control of the corporation to one faction of stockholders or of excluding another. See 3 W. Fletcher Cyc. Corp. § 850, at 206 (perm. ed. rev. 1965). Justice Douglas speaking for the Court in Pepper v. Litton, 308 U.S. 295, 311, 60 S.Ct. 238, 247, 84 L.Ed. 281 (1939), firmly restated this principle in the following language:

He who is in such a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standard of common decency and honesty . . . He cannot use his power for his own personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitations that it may not be exercised for the aggrandisement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis.

■ The principles enunciated above make it clear that officers and directors cannot utilize corporate instrumentalities such as *The American Rifleman* to perpetuate themselves in office. If the concepts of fiduciary duty and corporate democracy are to exist as something more than pious frauds, dissident stockholders must have the opportunity to alert fellow stockholders to alternative policies and programs. Corporate elections become hollow mockeries if candidates are unable to bring their candidacies and platforms to the attention of the stockholders at large.

In the instant case, plaintiffs Fitzgerald and Abelman have been thwarted in every attempt to place their viewpoint and Fitzgerald's candidacy before the general membership. Plaintiffs first sought a list of NRA members (to which they were entitled by virtue of N.P.C.L. § 621(b)) and were refused access. Defendant justified its refusal on the ground that the cost of a private mailing to the more than 1,000,000 NRA members would be prohibitive. The plaintiffs then sought to place an advertisement in *The American Rifleman,* announcing Fitzgerald's platform and candidacy, and asking for contributions. Although the advertisement was tendered along with proper payment, it too was denied.

In the Court's view, this series of events raises the spectre of management bad faith. At the very least, a great potential exists for the self-perpetuation of the incumbent NRA hierarchy.

The only justification defendant offers for refusing plaintiffs' advertisement is to point out that

[t]he defendant's magazine publishes as part of its advertising information a notice that it "reserves the right to reject or discontinue any advertisement and to edit all copy".

Defendant's brief pp. 1–2.

■ This explanation does not satisfy the heavy burden placed on directors and officers to justify their dealings with corporate shareholders. As was noted in the case of *In re* Brunner Air Compressor Corp., 287 F.Supp. 256, 263 (N.D.N.Y.1968):

[A director's] dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director . . . not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.

In view of the "equitable limitations" of decency and fair dealings imposed on defendant's management, and the special status of *The American Rifleman* as the corporate publication of the NRA and an integral part of its election process, it is this Court's opinion that the traditional right of a magazine to refuse publication of an advertisement must give way.

The defendant raises the additional argument that the relief sought by plaintiffs violates the First Amendment guarantee of a free press. In support of this argument, the defendant relies on Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L. Ed.2d 730 (1974), in which the Supreme Court struck down as unconstitutional a Florida statute which granted a political candidate the right to equal space to reply to newspaper criticism. This Court is not convinced that the *Tornillo* case is applicable where as here a commercial advertisement, rather than a political editorial or article, is involved. Even if *Tornillo* is read as extending First Amendment protection to a publisher's right to refuse paid advertising, however, it is the Court's view that on the particular facts of this case, the defendant's First Amendment right would not be abridged by requiring it to publish plaintiffs' advertisement.

In the case of Konigsberg v. State Bar of California, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961), the Supreme Court rejected the view that the freedoms of speech and association as pro-

tected by the First Amendment are absolutes in the sense that where constitutional protection exists, it must prevail.

In the case of Pittsburgh Press Co. v. Human Relations Comm'n, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), the Court took the same view in regard to the First Amendment guarantee of a free press.

No one is entitled to use the First Amendment protections as a shield behind which illegal activities are conductted, or legal obligations are shirked. As the Supreme Court noted in Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949):

> [I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.

 In the instant case, the Court has found that the defendant's refusal to publish plaintiffs' advertisement, at the very least, creates the potential for the violation of defendant's corporate trust. The Court has already noted the unusual nature of *The American Rifleman* and its special relationship to the NRA and to the plaintiffs. The guarantees of the First Amendment cannot serve as the justification for improper utilization of a corporate publication such as *The American Rifleman*. The First Amendment cannot be used as a pretext for denying stockholders their right to participate in corporate affairs.

In the instant case, the claims of constitutional deprivation are particularly ill founded. No effort is being made here to shackle *The American Rifleman* by forbidding it to espouse any editorial policies or to report any news events. Under normal circumstances, *The Ameri-*

*can Rifleman* would be the most convenient forum for reaching the membership at the NRA. However, following defendant's refusal to supply the plaintiffs with a membership list, the *Rifleman* becomes the only forum for reaching the membership. It is not an abridgement of anyone's First Amendment rights to require the NRA's management to live up to its obligations to deal fairly and honestly with the association's membership, and to maintain a viable corporate democracy in the only manner possible given the circumstances the management itself has created.

To conclude, it is this Court's opinion that it is the duty of the NRA's directors and officers to take all necessary steps to insure an informed electorate and fair corporate elections. The Court does not believe, however, that the defendant should be required to do more than is absolutely necessary to provide this insurance.

The Court believes that the maintenance of a viable corporate democracy in this case requires that the plaintiffs be permitted to alert their fellow NRA members to their policy positions and to Fitzgerald's candidacy. It does not believe that corporate democracy requires the defendant to allow plaintiffs the opportunity to solicit campaign contributions through the pages of *The American Rifleman*.

It is therefore, on this 23rd day of September, 1974

ORDERED that upon tender of proper payment *The American Rifleman* accept and publish the advertisement originally submitted by the plaintiffs, except for the following lines:

"Is your gun worth a buck" . . .

"And your contributions to his campaign".

Plaintiffs shall submit an appropriate Order, consented to, at least as to form, by the defendant.